**Marilyn RAHMAN, individually, and as Personal Representative of the Estate of Christopher Rahman, Appellant,**

v.

**The MAYO CLINIC, et al., Respondents.**

**No. C4–97–2200.**

Court of Appeals of Minnesota.

May 26, 1998.

Review Denied July 30, 1998.

erred in granting summary judgment under the Uniform Anatomical Gift Act's (UAGA) good faith immunity provision, Minn.Stat. § 525.9221(c) (1996).

## FACTS

On March 17, 1994, Christopher Rahman (the decedent) was admitted to Saint Mary's Hospital, as the result of a self-inflicted gunshot wound to the head. The decedent was placed in the intensive care unit, where he was treated by Dr. Marc Goldman (treating physician), the chief resident associate of the Clinic's neurosurgery department. The following day, the treating physician determined the decedent's neurologic condition was "very poor" and concluded the gunshot wound would prove fatal. The treating physician informed the decedent's mother, Marilyn Rahman (Rahman), of his prognosis and that she had a right to make a donation of organs and tissue pursuant to the Uniform Anatomical Gift Act (UAGA), Minn.Stat. § 525.9214(a) (1996). Elizabeth Gayner, an employee of Life Source, a tissue and organ procurement agency, also spoke with Rahman at the Clinic to explain organ and tissue donation.

That same day, the decedent was declared brain-dead. Rahman again spoke with the treating physician and agreed to make a donation of organs and tissue. Rahman and the treating physician completed part of the organ donation permission form, which stated:

*Permission is granted for organ or tissue donation for transplantation, research or education purposes (subject to restrictions indicated below)—— Yes —— No.*
*Restrictions:*

The treating physician checked the "yes" box, wrote "none" on the restrictions line, and signed the form and placed it back into the decedent's medical charts. Rahman told the treating physician that she did not want a postmortem examination.

Subsequently, Rahman had a second conversation with Gayner. Rahman told Gayner that the decedent's organs were not to be used for medical research or education. Based on this conversation, Gayner wrote "no research" above the restriction area and

Charles T. Hvass, Jr., Hvass Weisman & King, Chartered, Minneapolis, and Mark G. Stephenson, Stephenson & Sutcliffe, P.A., Rochester, for appellant.

Leo G. Stern, Robin L. Preble, Fredrikson & Byron, P.A., Minneapolis (Ann E. Decker, Rochester, of counsel), for respondents.

Considered and decided by HUSPENI, P.J., and SHORT and WILLIS, JJ.

## OPINION

SHORT, Judge.

Marilyn Rahman brought suit against The Mayo Clinic after discovering it had retained her deceased son's pelvic block. On appeal from a grant of summary judgment in favor of the Clinic, Rahman argues the trial court

added the phrase "heart, heart for valve, lungs, liver, pancreas, Kidneys, long bones of lower extremities" to the restrictions line on the original organ donation permission form. Gayner failed to write "no education purposes" on the form. The treating physician was not present during Gayner's second conversation with Rahman, was unaware of Rahman's intentions to impose restrictions, and did not see the revised permission form.

After some of the decedent's organs were harvested for transplant purposes, the body was taken to an autopsy suite. Despite Rahman's objections, the coroner ordered an autopsy pursuant to Minn.Stat. § 390.11, subd. 2 (1996), due to the violent nature of the decedent's death. An autopsy was performed by a Clinic pathologist and pathology resident. As a standard part of the autopsy procedure, the decedent's pelvic block, which consists of the prostate, seminal vesicles, urinary bladder, and rectum, was removed and examined. The pathologist, who had read a copy of the revised organ donation permission form prior to performing the autopsy, decided to retain the pelvic block for educational use in the Mayo Medical School. The pelvic block, which would eventually be mounted in Plexiglass for use in the medical school, was placed into a container with fixative fluid for preservation and kept in a locked storage room, known as the "museum," at the Clinic.

Shortly thereafter, Rahman brought an unrelated suit against the decedent's life insurance carrier regarding death benefits. This suit was settled. During a review of her attorney's files, Rahman read that the decedent's urinary bladder, prostate, and seminal vesicles had been "preserved with [his] pelvic block for [the] museum." Rahman retained new counsel, who contacted the Clinic and discussed Rahman's concerns. The Clinic informed Rahman's counsel the pelvic block had not yet been used for research or educational purposes, and sought further instructions. Rahman commenced this lawsuit against the Clinic, Mayo Foundation, Mayo Group Practices, Mayo Foundation for Medical Education and Research, and Mayo Medical Services, Ltd. (collectively "the Clinic"), alleging it: (1) violated the UAGA, Minn.Stat. § 525.9212 (1996); (2) intentionally, recklessly, or negligently re-

moved, withheld, mutilated, or operated upon the decedent's body; and (3) intentionally or unintentionally caused Rahman emotional distress.

## ISSUE

Did Rahman present any evidence to defeat the Clinic's claim it acted in good faith under the UAGA?

## ANALYSIS

On appeal from a grant of summary judgment, we must determine whether any genuine issues of material fact exist and whether the trial court erred in applying the law. Minn. R. Civ. P. 56.03; *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). While we view the evidence in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to create an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We need not defer to the trial court's decision on purely legal issues. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

Minnesota has adopted, without substantial modification, the UAGA. *See* Minn.Stat. §§ 525.921–.9224 (1996) (providing method of making anatomical gifts). The UAGA

> establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the circumstances under which such a gift must be deemed null and void.

*Nicoletta v. Rochester Eye & Human Parts Bank, Inc.*, 136 Misc.2d 1065, 519 N.Y.S.2d 928, 931 (N.Y.Sup.Ct.1987). The UAGA was enacted in response to the need for more family donations of organs and to the medical profession's uncertainty about whose consent was necessary for donations. *Perry v. Saint Francis Hosp. & Med. Ctr.*, 886 F.Supp. 1551, 1557 (D.Kan.1995); *see Unif. Anatomical Gift Act (1968) Prefatory Note*, 8A U.L.A. 64–65 (1993) (recognizing need for comprehensive act addressing organ donation and concluding UAGA, wherever enacted, will eliminate uncertainty and protect all parties); *see also* Gloria J. Banks, *Legal and Ethical*

*Safeguards: Protection of Society's Most Vulnerable Participants in a Commercialized Organ Transplantation System*, 21 Am. J.L. & Med. 45, 67 (1995) (stating UAGA amended in 1987 to better address issues, such as concern over providing "encouraged volunteerism" system with teeth needed to increase supply of transplantable organs); E. Blythe Stason, *The Uniform Anatomical Gift Act*, 23 Bus. Law 919, 921–24 (1968) (recognizing legal uncertainties of organ donation laws during pre-UAGA era as providing major basis for adoption of model act).

In furtherance of its goals, the UAGA provides, in pertinent part:

(a) If, at or near the time of death of a patient, there is no documentation in the medical record that the patient has made or refused to make an anatomical gift, the hospital administrator or a representative designated by the administrator shall discuss with the patient or a relative of the patient the option to make or refuse to make an anatomical gift and may request the making of an anatomical gift pursuant to section 525.9211 or 525.9212. The request must be made with reasonable discretion and sensitivity to the circumstances of the family. * * * An entry must be made in the medical record of the patient, stating the name of the individual making the request, and the name, response, and relationship to the patient of the person to whom the request was made

Minn.Stat. § 525.9214(a). The UAGA further provides:

An anatomical gift by a person authorized * * * must be made by (i) a document of gift signed by the person, or (ii) the person's telegraphic, recorded telephonic, or other recorded message, or other form of communication from the person that is contemporaneously reduced to writing and signed by the recipient.

Minn.Stat. § 525.9212(c).

The Clinic moved for summary judgment arguing: (1) it had permission to retain the decedent's pelvic block for educational purposes, and in the alternative; (2) it was immune from liability under the UAGA's good faith immunity provision. In granting the Clinic's motion, the trial court concluded Rahman "failed to provide *any* evidence that the [Clinic] acted in deliberate contravention of [Rahman's] wishes." (Emphasis in original.) We are asked whether the Clinic's actions fall within the UAGA's good faith immunity provision.

The UAGA insulates individuals involved in the organ procurement process from civil and criminal liability, so long as they act in good faith. *See* Minn.Stat. § 525.9221(c) (providing hospital or person, acting in accordance with UAGA or with applicable anatomical gift law of another state or foreign country or attempting in good faith to do so, is not liable for that act in civil action or criminal proceeding). That statute provides immunity from suit, not simply a defense to liability. *Cf. Mjolsness v. Riley*, 524 N.W.2d 528, 530 (Minn.App.1994) (concluding Minnesota's Civil Commitment Act, which provides all persons acting in good faith pursuant to Act are not subject to any civil or criminal liability, provided complete immunity from suit, not simply defense to liability). Whether actions constitute good faith is a question of law, properly resolved on summary judgment. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (concluding because qualified immunity was an immunity from suit rather than mere defense to liability, it is appropriately resolved at summary judgment phase); *see, e.g., Kelly–Nevils v. Detroit Receiving Hosp.*, 207 Mich.App. 410, 526 N.W.2d 15, 19 (1995) (holding question of good faith under UAGA properly matter of law for court); *Nicoletta*, 519 N.Y.S.2d at 931 (concluding issue of whether hospital acted in good faith question of law appropriate for review on summary judgment); *Brown v. Delaware Valley Transplant Program*, 420 Pa.Super. 84, 615 A.2d 1379, 1383 (1992) (quoting *Nicoletta* and concluding undisputed facts of record establish good faith of hospital as matter of law).

Neither the Minnesota legislature nor Minnesota courts have defined good faith in the context of the UAGA. However, other jurisdictions consistently define this statutory good faith requirement as activity involving an "honest belief, the absence of malice, and the absence of design to defraud or to seek an unconscionable advantage." Henry Campbell Black, et al., *Blacks Law Dictio-*

*nary* 623 (5th ed.1979), *construed in Perry,* 886 F.Supp. at 1558, *Lyon v. United States,* 843 F.Supp. 531, 533 (D.Minn.1994), *Kelly–Nevils,* 526 N.W.2d at 20, *Nicoletta,* 519 N.Y.S.2d at 930. In keeping with the UAGA's goal of providing uniformity among states, we adopt that definition of good faith. *See Perry,* 886 F.Supp. at 1558 (adopting same general definition of good faith in order to assure uniformity in enforcement and interpretation of UAGA among different states).

Both the treating physician and Gayner discussed organ donation with Rahman. Both completed parts of the organ donation permission form under Rahman's direction. With Gayner, Rahman expressed her desire that the decedent's organs not be used for medical research or education. Thus, the question of the Clinic's immunity turns on whether Rahman's instructions to Gayner are sufficient to negate the Clinic's claim that it acted out of an honest belief, and in the absence of fraud or design to seek an unconscionable advantage.[1] *See, e.g., Lyon,* 843 F.Supp. at 534 (concluding issue of hospital's good faith turns on whether everyone at hospital relied on signed form or whether hospital arranged for enucleation despite fact someone in authority knew family did not consent).

The undisputed facts are critical to our analysis. Despite Rahman's instruction that the decedent's organs not be used for medical research or education, Gayner only wrote "no research" on the permission form, and "heart, heart for valves, lungs, liver, pancreas, Kidneys, long bones of lower extremities" on the restrictions line. Therefore, the revised organ donation permission form did not prevent the use of organs for educational purposes. The Clinic's pathologist read that form and decided to retain the pelvic block for educational use at the Mayo Clinic School. However, after learning Rahman's true intentions, the Clinic immediately attempted to correct the error.

Viewing the evidence in the light most favorable to Rahman, we conclude Rahman's conversation with Gayner is insufficient to negate the Clinic's claim that it acted in good faith because the Clinic pathologist relied on a facially valid organ donation permission form and, unaware of Rahman's actual wishes, acted out of an honest belief that retention of the decedent's pelvic block was in accordance with those wishes. *See Perry,* 886 F.Supp. at 1559 (concluding court can find as matter of law that hospital's actions were taken in good faith even when person in authority had actual notice of contrary indications); *see also Nicoletta,* 519 N.Y.S.2d at 931 (concluding Eye Bank entitled to good faith immunity when agent acted in justified reliance on written permission form that complied with requirements of UAGA and plaintiff failed to present any evidence Eye Bank had actual notice of any opposition to gift); *see, e.g., Lyon,* 843 F.Supp. at 535–36 (concluding hospital entitled to good faith immunity despite one doctor's knowledge of plaintiffs' contrary intentions where hospital employees relied on organ donation form and were unaware of plaintiffs' wishes).1

Rahman also argues the good faith immunity provision of the UAGA is inapplicable because the Clinic removed the decedent's pelvic block during an autopsy, after the organ donation process was complete. *See* Minn.Stat. § 525.9221(c) (providing good faith immunity only to individuals acting in accordance with UAGA). However, the UAGA does not require organs to be harvested before an autopsy is performed; the statute specifically permits harvesting any time after death, and prior to embalming. *See* Minn.Stat. § 525.9217(a) (providing donee, upon death of donor and before embalming, shall cause body part donated to be removed without unnecessary mutilation); *see also* Minn.Stat. § 525.9213(a) (providing coroner or medical examiner may release and permit removal of body part within official's

---

1. Rahman alleges Gayner was a designee of the Clinic because she: (1) spoke with Rahman; (2) completed organ donation forms; and (3) oversaw the organ donation process. *See* Minn.Stat. § 525.9214(a) (providing hospital administrator or ———————— representative designated by administrator shall discuss with patient

or relative option to make or refuse to make anatomical gift). Due to the posture of this case, we must assume Gayner is a designee of the Clinic. *See Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (concluding on appeal from grant of summary judgment, court must accept as true factual allegations of nonmoving party).

custody for transplantation or therapy under certain circumstances). Here, the Clinic's actions were taken pursuant to the UAGA. The Clinic's organ donation permission form, which places no time restrictions on the organ donation process, accompanied the decedent's body to the autopsy suite. The organ donation permission form was relied on by the pathologist, who decided to retain the decedent's pelvic block for educational purposes. Moreover, Rahman's lawsuit is based on her belief that, in retaining the decedent's pelvic block, the Clinic exceeded its authority under the UAGA. Under these circumstances, the UAGA, not the autopsy statute, is controlling. Thus, we conclude the Clinic's retention of the pelvic block after an autopsy does not prevent application of the UAGA's good faith immunity provision.

■ Rahman finally argues the Clinic may not use its own ambiguous forms to justify exceeding a patient's consent. However, the revised organ donation permission form unambiguously permits retention of organs for educational purposes. Even assuming an ambiguity existed, it would be insufficient to overcome the Clinic's claim of good faith immunity unless Rahman demonstrated the Clinic failed to act out of an honest belief that its actions were in accordance with Rahman's wishes. *See, e.g., Perry,* 886 F.Supp. at 1559–60 (concluding hospital not entitled to summary judgment based on good faith immunity where there was evidence of conscious or intentional wrongdoing carried out for dishonest purposes or furtive design).

### DECISION

Rahman failed to allege any facts that demonstrate the Clinic acted dishonestly, maliciously, fraudulently, or unconscionably. There are no genuine issues of material fact to preclude summary judgment in favor of the Clinic.

**Affirmed.**