RICHARD CAREY & another[1] *vs*. NEW ENGLAND ORGAN BANK
& others.[2]

Essex. January 5, 2006. - March 15, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Uniform Anatomical Gift Act. Gift Statute. Statute,* Construction. *Words,* "In good faith."

In a civil action arising from the plaintiffs' unsuccessful attempt to donate the tissues of their deceased son for transplantation, the judge properly granted summary judgment in favor of the defendants, where the Massachusetts version of the Uniform Anatomical Gift Act, G. L. c. 113, §§ 7-13, did not require the defendants (an organ bank and an eye and tissue bank), which were not the designated representatives of the hospital to which the plaintiffs' son had been transported, to inform the plaintiffs of their opportunity to donate gifts for transplantation, nor did the statute prohibit the defendant organ bank's representative from having such a discussion with the plaintiffs [278-280]; further, the statute did not require the defendants to apprise the plaintiffs of any reason that their son's gift might not qualify for human donation [280]; moreover, although the defendant organ bank's representative failed to record properly the plaintiff father's telephonic consent [280-282], the omission did not render the defendants liable under the statute, where the plaintiffs did not carry their burden of demonstrating that the defendants, in doing so, did not act in good faith in accordance with the terms of the statute [282-285].
This court declined to consider an argument that was not raised in the trial court. [285]

CIVIL ACTION commenced in the Superior Court Department on March 29, 2002.

The case was heard by *David A. Lowy*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Roy F. Gelineau* (*Anthony Kline* with him) for the plaintiffs.

[1]Margaret Carey.
[2]New England Eye & Tissue Transplant Bank and Tissue Banks International.

*Pamela S. Gilman* (*Andrew R. Weiner* with her) for New England Organ Bank.

*Brian Sullivan*, for New England Eye & Tissue Transplant Bank & another.

COWIN, J. The plaintiffs in this case, Richard and Margaret Carey, seek recovery for the actions of the defendants, New England Organ Bank (the Organ Bank) and New England Eye & Tissue Bank (the Eye & Tissue Bank), and the parent organization of the Eye & Tissue Bank, Tissue Banks International (TBI).[3] The claims arose from an unsuccessful attempt by the plaintiffs to donate the tissues of their deceased son for transplantation. The complaint in the Superior Court stated claims for negligence, misrepresentation, tortious interference with a dead body, and negligent infliction of emotional distress. The defendants moved for summary judgment. Although the complaint contained only the aforementioned counts, materials submitted in connection with the defendants' motion for summary judgment essentially transformed the case into one involving issues of compliance with the Massachusetts version of the Uniform Anatomical Gift Act (UAGA), G. L. c. 113, §§ 7-13 (the statute). A judge granted summary judgment to the defendants after determining that the "good faith" provision of the statute, G. L. c. 113, § 13 (*c*), provided them with immunity.

Since the statute has not yet been construed in Massachusetts, we discuss the statute's provisions as they relate to this case, examine whether the defendants failed to comply with any provision of the statute, and if so, address whether the defendants are immunized against judgment by the "good faith" provision, *id.* We conclude that most of the acts or omissions that generated this dispute did not contravene the statutory requirements and that, as to the sole statutory violation, the defendants are protected by the "good faith" section.

A brief overview of the statutory scheme is helpful to an

---

[3]In the Superior Court, the Eye & Tissue Bank asked that its position be considered separately from that of the Organ Bank, but on appeal it has adopted all of the Organ Bank's arguments, noting only that it stands in a somewhat different posture with respect to certain facts. As will be apparent, most claims in the case relate to actions of the Organ Bank alone. The differences do not affect our resolution of the case.

understanding of the dispute. The UAGA, as approved by the National Conference of Commissioners on Uniform State Laws in 1968, was codified in Massachusetts (with changes immaterial to this case) as G. L. c. 113, §§ 7-13. See St. 1971, c. 653. The UAGA was intended, among other things, to "encourage the making of anatomical gifts" by eliminating uncertainty as to the legal liability of those authorizing and receiving anatomical gifts, while respecting dignified disposition of human remains. Prefatory note to UAGA (1968), 8A U.L.A. 71 (Master ed. 2003). Improved clarity was particularly beneficial because, typically, time is very limited for consent and procurement of certain body parts. See, e.g., comment to UAGA (1968) § 2(b), *supra* at 117. Some variation of the UAGA was adopted by all fifty States and the District of Columbia.[4] Prefatory note to UAGA (1987), *supra* at 4.

We summarize the portions of the statute that are pertinent to this appeal. Certain parties (essentially the next of kin of the decedent) may make an anatomical donation "after death or immediately before death," but a recipient is prohibited from accepting a gift where it has "actual notice of contrary indications by the decedent" or notice that the gift "is opposed by" certain other persons.[5] G. L. c. 113, § 8 (d). Qualified banks or storage facilities may receive "gifts of bodies or parts thereof" for medical education, research, therapy, or transplantation. G. L. c. 113, § 9 (3). "Any [anatomical] gift . . . shall be made by a document signed by [the person giving consent], or made by his telegraphic, recorded telephonic or other recorded message." G. L. c. 113, § 10 (e). At the time of the gifts in this case, hospitals or their designated representatives were required to "inform" certain persons of "the opportunity" to authorize "a

---

[4]The Uniform Anatomical Gift Act (UAGA) was revised in 1987, but the revisions were accepted less broadly, see UAGA (1987), 8A U.L.A. 3 (Master ed. 2003), and were not adopted by the Massachusetts Legislature.

[5]General Laws c. 113, § 8 (d), states in pertinent part: "If the donee has actual notice of contrary indications by the decedent, or that a gift authorized by a member of a class is opposed by a member of the same or a prior class, the donee shall not accept the gift . . . ." Section 8 (d), by way of reference to G. L. c. 113, § 8 (b), as appearing in St. 1986, c. 360, § 2 (b), also sets forth who may make a gift of all or part of the body of a decedent, generally the next of kin beginning with the spouse, then an adult son or daughter, then either parent, and so on. See note 6, *infra*.

gift of all or part of the decedent's body for purposes of organ and tissue transplantation."[6] G. L. c. 113, § 8 (b), as appearing in St. 1986, c. 360, § 2 (b). The requirement to inform applied, however, only if "(1) no actual notice of contrary intentions by such persons ha[d] been received, (2) such information [would] not cause undue emotional stress to the next of kin[,] and (3) consent to such transplantation would yield an organ or tissue donation suitable for use in accordance with medical criteria . . . ."[7] Id. "A person who acts in good faith in accordance with the terms of" the statute "shall not be liable" civilly or criminally "for his act." G. L. c. 113, § 13 (c).

The plaintiffs contend that the defendants' acts were not authorized by the statute, and seek to identify genuine issues of material fact to defeat the grant of summary judgment. This appeal requires that we interpret the provisions for the first time. We hold that the judge correctly concluded that no genuine issue of material fact prevented the allowance of summary judgment.

*Background.* On review of summary judgment, we make all permissible inferences favorable to the nonmoving party, here the plaintiffs, and resolve any disputes or conflicts in the summary judgment materials in their favor. *Willitts* v. *Roman*

---

[6] General Laws c. 113, § 8 (b), as appearing St. 1986, c. 360, § 2 (b), stated in pertinent part that, in certain circumstances, on "the occurrence of death in an acute hospital, the director or other person in charge of such hospital, or his designated representative, including, but not limited to, the physician responsible for the care of the patient, shall inform any of the persons listed below [such as either parent] . . . of the opportunity of authorizing a gift of all or part of the decedent's body for purposes of organ and tissue transplantation . . . ." The section was recently amended, see St. 2005, c. 145, § 5, to shift the responsibility for notification to "the federally designated organ procurement organization or . . . eye or tissue bank." The section containing these requirements is now G. L. c. 113, § 8 (c).

[7] At the time relevant to this case, the statute stated that suitability was to be expressly determined by "medical criteria as defined by physicians . . . and as established by rules and regulations promulgated by the department [of public health] . . . ." G. L. c. 113, § 8 (b) (3). The applicable regulations at the time provided no guidance as to suitability. See 105 Code Mass. Regs. §§ 800.004, 800.036 (1994). The parties assume that the applicable Federal regulations are a proper source of authority, and thus we do not address the issue. The reference in the statute to the manner of determining suitability was recently removed and is no longer part of the statute. See St. 2005, c. 145, § 5.

*Catholic Archbishop of Boston*, 411 Mass. 202, 203 (1991). See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). The evidence in the record viewed in this manner is as follows.

The plaintiffs' sixteen year-old son, Adam Carey, was mortally injured in a vehicle mishap at the Kernwood Country Club in Beverly at about 10 A.M. on September 16, 2000. Adam received emergency treatment and was taken to a local hospital, but died about one hour later, at 10:58 A.M. Hospital staff discussed anatomical donation with the plaintiffs and then contacted the Organ Bank, whose representative, Jorge Duran, spoke with Adam's father, Richard Carey, by telephone about the giving of an anatomical gift.

The Organ Bank's procedure at the time called for its representative to read, by telephone, to the appropriate person (here, the father) a form entitled "Consent for Organ and Tissue Donation," and record the responses. The form was essentially a lengthy checklist that permitted the parent or other authorized person to consent or refuse with respect to many specific tissues and organs, and to consent or refuse to allow use of gifts for medical research if the organs or tissues were determined to be unsuited to transplantation and therapy.

Duran followed this procedure. At 1:06 P.M., about two hours after Adam expired, Duran completed the consent form while speaking with the father by telephone. Tara Conway, also an Organ Bank employee, listened to the conversation on another telephone and signed the form as a witness.

Federal regulations in effect at the time prohibited transplantation of organs and tissue if so much saline had been infused into the donor that the resulting dilution of blood would significantly affect testing for infectious diseases, and no preinfusion sample was available for testing. See 21 C.F.R. § 1270.21(h)(2) (2000). Moments before Duran completed the consent form, a nurse at the hospital reported to Duran, among other things, that Adam had received substantial infusions of saline during emergency treatment, and that no preinfusion samples of his blood were available for testing.[8] On receipt of this information, Duran had sufficient information to determine, had he performed the

---

[8]The record does not suggest that the nurse limited her search to samples located at the hospital.

necessary calculation, that Adam's tissues would not be suitable for human transplantation.

Duran never told Adam's father that Adam might be ineligible to be a transplant donor. Instead, he completed the consent form. Adam's father made a gift of Adam's skin, blood vessels, eyes, and certain other tissues for transplantation or therapy. Duran recorded these responses. Viewing the evidence in the light most favorable to the plaintiffs, Adam's father refused to donate Adam's heart "for valves," brain, or a specific blood vessel.[9] Duran indicated the opposite, i.e., that the father consented to a gift of these tissues and organs. Adam's father similarly refused to permit use of the tissues and organs for medical research if not useable for transplantation or therapy. Duran nonetheless wrote the opposite.[10,11] The Organ Bank did not make an audio rec-

---

[9]The Organ Bank separately sought consent for a particular blood vessel because procurement would require an incision in the abdomen of the donor as opposed to the leg and groin areas for other commonly harvested vessels.

[10]Duran completed the form as follows, in pertinent part:

"I, as Father of Adam Carey . . . direct that in the event of death, a gift be made to the NEW ENGLAND ORGAN BANK and/or NEW ENGLAND EYE AND TISSUE TRANSPLANT BANK of organs and tissues of the patient for transplantation, therapy, or research. . . . I authorize the performance of all necessary tests and procedures, including testing for the HIV antibody, to determine the medical suitability of the organs and tissues for the purposes intended.

"*Description of Gift*[.] Organs and tissues donated for transplantation or therapy . . . : Kidneys[:] No[.] Liver (Hepatocytes)[:] No[.] Heart[:] No[.] Lungs[:] No[.] Pancreas (Islet Cells)[:] No[.] Small Bowel[:] No[.] Spleen and Lymph Nodes[:] No[.] Bone Marrow[:] No[.] Heart for valves[:] Yes[.] Pericardium[:] Yes[.] . . . Skin[:] Yes[.] Eyes[:] Yes[.] Bone and associated tissues[:] Yes[.] Blood Vessels[:] Yes[.] Other[:] A-I graft[:] Yes[.]

"If the organs and tissues I have donated for transplantation and therapy cannot be used for those purposes, I agree that those organs and tissues may be used for medical research. In addition to any organs and tissues noted above that may be used for medical research, I also consent to the gift of the following organs and tissues for medical research[:] Brain."

[11]At oral argument, the defendants asserted that the father's affidavit denying consent contradicted his deposition testimony, but the defendants admitted that they failed to include the relevant pages of the transcript in the summary judgment record. Instead, they direct the court to a transcript of the motion

ording of the conversation.[12]

Based on Duran's rendering of the father's wishes, which we assume for purposes of this decision was inaccurate, the Organ Bank proceeded to harvest Adam's tissues. An organization apparently acting on its behalf, Cryolife, Inc., procured several blood vessels from Adam's body at about 8:30 P.M., including the vessel for which Adam's father refused consent. At about 9 P.M., the Eye & Tissue Bank recovered Adam's corneas and a graft of skin. There is no evidence that Adam's heart valves and brain, for which Duran inaccurately recorded consent, were harvested, and there is no dispute with respect to these body parts.

During the next few days, the defendants noted that the harvested tissues were unsuitable for transplantation for various reasons. The tissues were discarded, and no anatomical gifts were used for those purposes or for medical education or research.

Despite this, the defendants contacted the plaintiffs by letter to report erroneously they had achieved success rather than failure. The Eye & Tissue Bank wrote that Adam's right cornea had been successfully transplanted. The Organ Bank wrote that the harvested blood vessels were in quarantine and would later be transplanted, although by that time they had been rejected. In a subsequent letter, the Eye & Tissue Bank apologized for giving the plaintiffs incorrect information and explained that at the time of writing its letter, it had been "making every effort to place Adam's tissue with local researchers," consent for which Adam's father had refused. The plaintiffs eventually asked for

hearing in the Superior Court in which an attorney for the Organ Bank purported to read portions of the deposition transcript to the motion judge. The attorney's statements appear marginally relevant to whether the form, as completed by Duran, reflected the father's responses, and the plaintiffs did not address the issue. We decline to consider the testimony because the relevant deposition transcript did not accompany the motion for summary judgment, the supposed contradiction was not timely or properly put in issue, and nothing in the record shows that the plaintiffs had an adequate opportunity to respond. See Rule 9A(a)(1), (b)(2) of the Rules of the Superior Court (2005). See also Mass. R. Civ. P. 56 (a), (e), 365 Mass. 825 (1974).

[12]The Organ Bank stated at oral argument that at the time of these events, it was contemplating audiotape recording of telephonic consent. Such a procedure would obviate problems such as occurred here.

the return of Adam's remains for internment; because the remains had already been discarded, that request was never fulfilled. TBI wrote on behalf of the Eye & Tissue Bank that it "truly apologize[d] for th[e] miscommunication."

Other activities of the defendant organizations are also relevant to the plaintiffs' arguments. The defendants are organized to promote, coordinate, and implement the recovery, preservation, and distribution of organs for charitable purposes. However, subsequent to these events, both the Organ Bank and TBI, the parent of the Eye & Tissue Bank, realized financial benefits from transactions involving anatomical gifts.[13]

As earlier described, the plaintiffs filed suit on various theories. The defendants moved for summary judgment, arguing that the plaintiffs failed to meet their burden of showing that the defendants' actions were not "in good faith in accordance with" the statute.[14] A judge allowed the motion and dismissed the complaint. The plaintiffs appealed and we transferred the case to this court on our own motion.

*Discussion.* On appeal, the plaintiffs contend that the defendants did not adhere to the statute in several respects. They contend that G. L. c. 113, § 8 (*b*), prohibited the Organ Bank from soliciting their consent for anatomical donations, and that it is liable for having done so in this case; that, although not expressed in the statute, the Organ Bank must inform those authorizing anatomical donations of any circumstance affecting the usability for human transplantation of the gift, and that its failure to do so invalidated consent; and that the Organ Bank failed to "record" consent as required in G. L. c. 113, § 10 (*e*). The plaintiffs further assert that the defendants "transgressed the scope of [the father's] consent" as a result of these inappropriate acts and that disputed issues of fact preclude summary judgment. They also claim that the defendants' letters after these events provide a ground for liability outside the scope of

[13]For example, during 2001 the Organ Bank sold its tissue inventory to a third-party distributor, recognizing "non-operating gain[s]" from the sale in 2001 and anticipating further such gains in future years.

[14]The defendants argued expressly that the plaintiffs presented insufficient evidence to allow a reasonable jury to conclude that they acted other than "in good faith in accordance with" the statute. Implicit in this is an argument that their actions complied with the statute. See *infra*.

the statute. The defendants argue that they acted at all times "in good faith in accordance with" the statute and are thus immune.

1. *Standard of review.* Summary judgment is appropriate if the materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Where the opposing party will have the burden of proof at trial, the moving party must demonstrate, by reference to materials properly in the summary judgment record, unmet by countervailing materials, "that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

"That some facts are in dispute will not necessarily defeat a motion for summary judgment. The point is that the disputed issue of fact must be material. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). *Norwood* v. *Adams-Russell Co.*, 401 Mass. 677, 683 (1988)." *Beatty* v. *NP Corp.*, 31 Mass. App. Ct. 606, 607-608 (1991). Only those facts that, if true, provide a basis for a reasonable jury to find for a party are material. See *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 556-557 (1976). "As to materiality, the substantive law will identify which facts are material." *Anderson* v. *Liberty Lobby, Inc.*, *supra* at 248. We examine the substantive law.

2. *Statutory requirements.* General Laws c. 113, § 13 (c), provides a defense for acts "in good faith in accordance with the terms of" the statute. This requires a two-step analysis of the defendants' acts: first, whether they were "in accordance" with the technical requirements of the statute and, if not, whether they were nevertheless "in good faith."[15] See *id.*; *Lyon* v. *United States*, 843 F. Supp. 531, 536 (D. Minn. 1994) (interpreting UAGA). We turn first to the question whether the defendants adhered to the requirements of the statute.

The plaintiffs contend that the defendants violated G. L. c. 113, § 8 (b), by participating in a discussion of the making of

---

[15]A revision of the UAGA, not adopted in Massachusetts, makes express what is implied by this section, that a good faith *attempt* to comply with the statute, whether successful or not, provides a defense to liability. See UAGA (1987) § 11(c), 8A U.L.A. 64 (Master ed. 2003).

an anatomical gift for purposes of transplant when sufficient facts were available to the Organ Bank's representative to establish that consent would yield no useable gift.[16] The plaintiffs argue that § 8 (*b*) implies a prohibition on solicitation of consent in such circumstances. We disagree.

Section 8 (*b*), since amended, see note 6, *supra*, required that a hospital or its "designated representative" inform certain individuals of "the opportunity" to donate gifts for transplantation, although a hospital was required to do so only if, among other things, consent would yield a gift appropriate for the purpose.[17] Nothing in the record indicates that the defendants were designated representatives of the hospital within the meaning of the statute, as then appearing. Instead, the uncontradicted evidence is that the hospital itself informed the plaintiffs of their "opportunity" and then referred them to the Organ Bank for further steps in the donation process. The statute placed the burden on the hospital, not the Organ Bank.

Even if the requirement of § 8 (*b*), as then in effect, did apply to these defendants, the section neither expressly nor implicitly prohibited what occurred here. On its face, the purpose of § 8 (*b*) was to ensure that in all cases where a gift would yield tissue or organs suitable for transplant, those authorized to consent to the giving of an anatomical gift were notified of their opportunity to do so.[18] See G. L. c. 113, § 8 (*b*), as appearing in St. 1986, c. 360, § 2 (*b*). Construing the provision as a "gag rule" would subvert its purpose. Cf. *Crocker* v. *Martha's Vineyard Comm'n*, 407 Mass. 77, 82 (1990) (statutory interpretation should reasonably effect purpose).

---

[16]The plaintiffs argue that both defendants are liable for the acts of only one. The defendants do not defend the grant of summary judgment on the basis that they performed different acts, and the differences do not affect our resolution of the case. See note 3, *supra*.

[17]The responsibility for providing this information is now on the "federally designated organ procurement organization or . . . eye or tissue bank." St. 2005, c. 145, § 5. See note 6, *supra*.

[18]A revision to the UAGA, not adopted by Massachusetts, stated somewhat more clearly that a "request [for anatomical donation] is not required if the gift is not suitable, based upon accepted medical standards . . . ." See UAGA (1987) § 5(*b*), 8A U.L.A. 44 (Master ed. 2003). The comments to the revision emphasized that this was a "variation of the required request concept." Comment to UAGA (1987) § 5, *supra* at 45.

In the circumstances, § 8 (*b*) neither obliged nor prohibited a discussion of "the opportunity" to make an anatomical gift. The duty to inform where certain conditions are present does not imply a prohibition in the absence of those circumstances. See *Commonwealth* v. *Super*, 431 Mass. 492, 497-498 (2000) (authorization to act in certain circumstances does not imply prohibition in absence of condition); *Prudential Ins. Co.* v. *Commissioner of Revenue*, 429 Mass. 560, 570 (1999) (same); *Child Support Enforcement Div. of Alaska* v. *Brenckle*, 424 Mass. 214, 224 (1997) (same). Even if the notification requirement applied to the Organ Bank, the unsuitability of Adam's tissues negated any responsibility pursuant to the section. See *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 45 (1991) (relating to contract law). We are satisfied that § 8 (*b*) did not prohibit the Organ Bank's solicitation.

Next, the plaintiffs attempt to import common-law notions of informed consent, see *Harnish* v. *Childrens' Hosp. Med. Ctr.*, 387 Mass. 152, 155 (1982), to the area of post mortem anatomical donations. They argue that the Organ Bank should have apprised them of any articulable reason that Adam's gift might not qualify for human donation, and that the Organ Bank's failure to disclose information of this nature invalidated their consent.

The statute prescribes in detail the manner of obtaining consent for post mortem gifts. It provides in § 8 (*d*) that a parent (or another) may authorize a gift and that a donee may accept it unless contrary wishes were expressed by the donor or other persons with a similar connection to the decedent. The statute does not suggest any limitation with respect to disclosure of risk factors for unsuitability. See G. L. c. 113, § 8 (*d*). Expression of one or more limitations implies exclusion of all others. *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 620 (1997). Moreover, importing such a disclosure requirement would raise the specter of litigation whenever a donated organ later proved unsuitable for transplantation, thereby resurrecting the very disincentives the statute seeks to eliminate. Consent in accordance with § 8 (*d*) was all that was required.

Finally, the plaintiffs argue that they presented sufficient evidence to create a jury question whether the Organ Bank adequately recorded the father's consent. General Laws c. 113,

§ 10 (*e*), specifies that "[a]ny gift by a person . . . [such as a father] shall be made by a document signed by him, or made by his telegraphic, recorded telephonic or other recorded message." A comment to the UAGA emphasizes that the provision addressed a problem encountered "[f]requently" because "the next of kin are [often] far away." See comment to UAGA (1968) § 4, 8 U.L.A. 130 (Master ed. 2003). Allowing for recording of consent even when the next of kin are geographically distant has "the advantage of expediting the [consent] where time for effective action is short." *Id.*

The plaintiffs advance two arguments with respect to the recording provision, § 10 (*e*). First, they argue that the Organ Bank's representative, Duran, erroneously indicated that the father had consented to the donation of certain body parts, as well as to their use in medical research, and therefore failed to "record" within the meaning of § 10 (*e*). Obviously, the defendants dispute that Duran, the Organ Bank's agent, misconstrued the father's statements regarding consent, but we assume for purposes of summary judgment that Duran completed the consent checklist incorrectly in some respects. However, mere inaccuracy or defective information, in itself, does not constitute noncompliance with the "recording" requirement of the subsection. Section 10 (*e*) is concerned with the manner of recording, not fidelity or quality.

The plaintiffs also argue that § 10 (*e*) requires audio recording of telephonic consent, and that the Organ Bank did not comply with this provision. The Organ Bank concedes it made no voice recording. Consent here was by telephone, and § 10 (*e*) requires that such communications be "recorded." In context, we think this means the capture of the father's voice for later reproduction and not simply transcription of the father's responses, as interpreted by Duran, on the Organ Bank's checklist. The Legislature explicitly set out a separate recording requirement for "telephonic" messages, presumably to avoid arguments such as those in the present case. The explicit requirement cannot be ignored.

Thus, viewing the evidence in the light most favorable to the plaintiffs, the only statutory noncompliance they have demonstrated is the omission of the Organ Bank to record properly the

father's telephonic consent, see G. L. c. 113, § 10 (e). As we have explained, pursuant to § 8 (b), as then in effect, the obligation of informing the father of the donative opportunity was directed to the hospital and its representatives, and there is no evidence that the defendants served in either role here. Moreover, the section did not prohibit the solicitation of consent. Finally, § 8 (d) has displaced common-law notions of informed consent, and consent to a gift in accordance with the statute is all that is required.

3. *Good faith.* Having identified an act or omission within the scope of the statute that did not comply with its requirements, i.e., failure to make a voice recording of telephonic consent, we proceed to examine whether the defendants nevertheless acted "in good faith" and are thus immune. G. L. c. 113, § 13 (c). We begin by addressing the meaning of "good faith" in this context and the burdens at the summary judgment stage.

The majority of other courts interpreting the term "good faith" in the UAGA have adopted the definition provided by *Nicoletta* v. *Rochester Eye & Human Parts Bank, Inc.*, 136 Misc. 2d 1065, 1067-1068 (N.Y. Sup. Ct. 1987). We do the same. Good faith is defined in this context, as elsewhere, see, e.g., *Hahn* v. *Planning Bd. of Stoughton*, 403 Mass. 332, 337 (1988), *S.C.*, 406 Mass. 1001 (1989) (award of attorney's fees), as an honest belief, the absence of malice, or the absence of a design to defraud or to seek an unconscionable advantage over another. See *Nicoletta* v. *Rochester Eye & Human Parts Bank, Inc.*, *supra.* See also *Pardo* v. *General Hosp. Corp.*, *ante* 1, 11-12 & nn. 23, 24 (2006) (surveying similar definitions of "good faith"). Lack of good faith, "even though it involves a determination of a state of mind, is not automatically a jury question." *Aarco, Inc.* v. *Baynes*, 391 Mass. 560, 564 (1984) (discussing malice).

Where a defendant seeks summary judgment on grounds of qualified immunity in the analogous and more fully developed area of "good faith" governmental immunity, see 42 U.S.C. § 1983 (2000), the burden of providing evidence of lack of good faith falls on the plaintiff. See *Crawford-El* v. *Britton*, 523 U.S. 574, 587-588, 600 (1998). See also 1 J.G. Cook & J.L. Sobieski, Civil Rights Actions par. 2.06[C], at 279-280 (2004).

"[T]he plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent" state of mind. *Crawford-El* v. *Britton, supra* at 600.

Other courts that have weighed the UAGA appear to have assigned the burdens in a similar fashion. See *Perry* v. *Saint Francis Hosp. & Med. Ctr., Inc.*, 886 F. Supp. 1551, 1557, 1559 (D. Kan. 1995); *Lyon* v. *United States*, 843 F. Supp. 531, 534-536 (D. Minn. 1994); *Andrews* v. *Alabama Eye Bank*, 727 So. 2d 62, 64 (Ala. 1999); *Rahman* v. *Mayo Clinic*, 578 N.W.2d 802, 805, 807 (Minn. Ct. App. 1998); *Brown* v. *Delaware Valley Transplant Program*, 420 Pa. Super. 84, 95-96 (1992); *Seamans* v. *Harris County Hosp. Dist.*, 934 S.W.2d 393, 396 (Tex. Ct. App. 1996); *Sattler* v. *Northwest Tissue Ctr.*, 110 Wash. App. 689, 699 (2002). Cf. *Ramirez* v. *Health Partners of S. Ariz.*, 193 Ariz. 325, 328, 330 (Ct. App. 1998) (similar allocation of burden but different statutory language); *Kelly-Nevils* v. *Detroit Receiving Hosp.*, 207 Mich. App. 410, 419-420 (1994) (good faith immunity must affirmatively be pleaded by defendant). Contrast *Schembre* v. *Mid-America Transplant Ass'n*, 135 S.W.3d 527, 531 (Mo. Ct. App. 2004) (different statutory standard but burden of proving good faith or lack of negligence is on defendant). Thus, where a defendant moving for summary judgment contends, and makes at least a minimal showing, that it acted in good faith within the meaning of G. L. c. 113, § 13 (*c*), the burden falls to the plaintiffs to identify competent evidence sufficient for a reasonable jury to find to the contrary. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

The good faith immunity "is designed for situations . . . where because of confusion, an organ is removed without genuine consent." *Lyon* v. *United States, supra* at 536. Evidence of technical noncompliance with the statute will not suffice. See, e.g., *Sattler* v. *Northwest Tissue Ctr., supra* at 697.

Of course, the proffered evidence must not be "too remote, according to the ordinary course of events," *Commonwealth* v. *Doherty*, 137 Mass. 245, 247 (1884) (Holmes, J.), and must be "rationally susceptible" to the requested inference, *Wasserman* v. *Hollidge*, 267 Mass. 460, 470 (1929). See G. L. c. 113, § 13 (*c*).

"Evidence which merely raises a suspicion, or a surmise, or a conjecture, is not enough . . . ." *Hillyer* v. *Dickinson*, 154 Mass. 502, 504 (1891).

The plaintiffs argue that certain evidence in the record satisfied their burden. First, they argue that the defendants' noncompliance with the statute was "egregious[]," and therefore is evidence of a lack of good faith. We disagree. While it may be possible that evidence of peculiarly pervasive noncompliance could warrant an inference that a defendant acted maliciously, possessed a design to defraud or to seek an unconscionable advantage over the plaintiffs, or acted out of something other than an honest belief, see *Perry* v. *Saint Francis Hosp. & Med. Ctr., Inc.*, *supra* at 1559; *Nicoletta* v. *Rochester Eye & Human Parts Bank, Inc.*, *supra*, we agree with the judge that the inference is not warranted from the single violation in this case. The few mistakes in the consent form that the plaintiffs deem a deviation from the statute provide no evidence of lack of good faith. Although the manner of recording was incorrect, the Organ Bank's interpretation of the statute was not unreasonable, and we are unaware of any previous authoritative construction to the contrary. In the absence of definitive guidance on the manner of recording, completion of a written form reflecting the responses, with a witness listening and signing the consent form, cannot be deemed a lack of good faith.

The plaintiffs also contend that the subsequent letters misinforming them of use of Adam's gifts showed lack of good faith. However, despite several months of discovery, the plaintiffs failed to show that the errors were connected to one another by more than a common lack of administrative accuracy. The letters may, perhaps, constitute circumstantial evidence of lack of care, but they give rise to no more than conjecture or suspicion of lack of good faith. See *Hillyer* v. *Dickinson, supra.* See also *Nicoletta* v. *Rochester Eye & Human Parts Bank, Inc.*, *supra.* The judge was correct to conclude that the letters were not probative of the issue of good faith.

Finally, the plaintiffs maintain that the financial relationships between the defendants and other entities show a lack of good faith. They suggest the relationships increased the defendants' "zest to recover" anatomical gifts. However, the plaintiffs have

failed to show any significant connection between the financial relationships, initiated well after the defendants destroyed Adam's donated tissue and organs, and any failure to adhere to the statute in this case. See *Commonwealth* v. *Doherty, supra* (evidence must not be "too remote"). The inference of lack of good faith is unwarranted from the evidence in the record of the transactions.[19]

Thus, with respect to the sole instance of statutory noncompliance, the plaintiffs have not carried their burden of demonstrating a lack of good faith. See G. L. c. 113, § 13 (*c*). Summary judgment was appropriate with respect to the failure to record the gift.

4. *Conduct not within scope of statute.* The plaintiffs advance a new argument on appeal, i.e., that the sending of inaccurate letters by the defendants is not subject to the immunity of G. L. c. 113, § 13 (*c*), because the statute is silent on the matter of postrecovery communication, and they maintain that the sending of the letters constituted negligence which caused them harm. In the Superior Court, the plaintiffs argued only that the letters were relevant to the issue of "good faith" immunity.

"An issue not raised or argued below may not be argued for the first time on appeal." *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A.*, 405 Mass. 420, 421 n.2 (1989). The plaintiffs never put the judge on notice that they opposed summary judgment on this theory. Cf. *Douillard* v. *LMR, Inc.*, 433 Mass. 162, 168 n.3 (2001) (no waiver because not separate "theory" of recovery). Thus, we deem the issue waived. See *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A., supra.*

*Judgment affirmed.*

---

[19]Title 42 U.S.C. § 274e (*a*) and (*c*) (2) (2000) prohibits the knowing transfer of tissue or organs for valuable consideration, meaning compensation other than "reasonable payments associated with the removal, transportation, implantation, processing, preservation, quality control, and storage of a human organ or the expenses of travel, housing, and lost wages incurred by the donor of a human organ in connection with the donation of the organ." See UAGA (1987) § 10, 8A U.L.A. 62 (Master ed. 2003) (not adopted in Massachusetts). The plaintiffs cast aspersions, but nothing in the record shows that more than these "reasonable payments" flowed to the defendants.