Nickerson, Gary A., J.

INTRODUCTION

This action involves a dispute between neighboring landowners. In this case, the plaintiffs, Dr. Warren Woods and Joann Woods (the “Woodses”), claim that their oceanfront property has been damaged by their neighbors’ construction and maintenance of their coastal rock revetments.[3] The Woodses seek relief against their neighbors (Linda Brimm and the others listed in note 2) and the engineering firm which designed a portion of the revetments, Coastal Engineering, Inc. (“Coastal”).
Specifically, the Woodses’ Second Amended Complaint[4] states six claims: intentional tort, construction and maintenance of revetment (Count 1) and failure to conduct beach nourishment (Count 2); negligence, maintenance and construction of revetment (Count 3) and failure to conduct beach nourishment (Count 4); private nuisance (Count 5); and declaratory judgment pursuant to G.L.c. 231A (Count 6).[5] At the summary judgment hearing held on April 9 and 12, 2010, counsel for the Woodses acknowledged that the Woodses’ intentional tort claims are based on trespass.[6] The court will therefore refer to and analyze Counts 1 and 2 as trespass claims throughout this decision.
Several defendant landowners have brought cross-claims. Lois and Fred Armstrong (“Armstrongs”), Linda and Michael Brimm (“Brimms”), Ted Bilodeau (“Bilodeau”), Jacqueline Collins (“Collins”), Dana and Deborah Drew (“Drews”), Richard McLaughlin and Peter Marino (“McLaughlin-Marinos”), Maureen and Dave Moriarty (“Moriartys”), and Doris and Russell Olive (“Olives”) (collectively “Cross-Claim Defendants”) have brought cross-claims against all the other defendants, including Coastal Engineering, Inc. (“Coastal”), for contribution and indemnification.[7] The Brimms’ Amended Cross-Claim[8] added breach of contract and brgach of fiduciaiy duty claims against Coastal based on its alleged agency relationship with the former owner of the Brimms’ property, under which Coastal supervised construction of the Brimm revetment. Coastal has filed cross-claims against the Armstrongs, Bilodeau, the Brimms, Collins, the Drews, the McLaughlin-Marinos, the Moriartys and the Olives.[9]
Bilodeau, the Drews, the McLaughlin-Marinos, the Moriartys, and the Olives (collectively “Motion Defendants”) now move for summary judgment on the Woodses’ Second Amended Complaint.[10] Coastal also seeks summaiy judgment on the Woodses’ claims and on the cross-claims alleged by the Cross-Claim Defendants. For the following reasons, the motions of Bilodeau, the Drews, the McLaughlin-Marinos, the Moriartys, and the Olives are ALLOWED as to Counts 2, 4 and 6 of the Woodses’ Second Amended Complaint, ALLOWED in part as to Count 1, and DENIED as to Counts 3 and 5. Coastal’s motion is ALLOWED as to Counts 1, 3, 5, and 6 of the Woodses’ Second Amended Complaint and also ALLOWED as to the Cross-Claim Defendants’ claims.

BACKGROUND

The Woodses own oceanfront property at 150 Third Street on Lieutenant’s Island in Wellfleet, Massachusetts (“Woodses Property”). The Woodses Property is located east/northeast of the Motion Defendants’ neighboring properties. The Motion Defendants’ properties border the western shore of Lieutenant’s Island: Bilodeau at 100 Second Avenue; the Brimms at 155 Third Street; the Drews at 80 Second Street; the McLaughlin-Marinos at 114 Fourth Street; the Moriartys at 35 Arthur Cashin Way; and the Olives at 113 Fourth Street.
Lieutenant’s Island is located in Wellfleet Harbor. Lieutenant Island’s coast is subject to wave, current, and tidal forces, which cause the erosion and accretion of sand.[11] Historically, the beach and coastal dunes bordering the Woodses property grew through accretion from sand carried along the coast by wind, currents and waves. The sand deposited in front of the Woodses property originated on the beaches, dunes and coastal banks of the Motion Defendants’ properties.[12] Since the construction of revetments along the Motion Defendants’ properties much less sand has been deposited in front of the Woodses property and the sand that historically accumulated has eroded away, thereby exposing the Woodses property directly to erosion from strong currents and storm waves.
A. Motion Defendants’ Revetment Permitting & Construction Process
In 1982, the Massachusetts Department of Environmental Protection (“DEP”) issued a Coastal Wetland Protection Order pursuant to G.L.c. 130, §105 (“DEP Order”), identifying wetland resources entitled to protection on Lieutenant Island. The DEP Order prohibited certain activities, stating: “no person shall perform any act or use any coastal wetland in a manner which could destroy natural vegetation of the coastal wetland, substantially alter existing patterns of tidal flow, obstruct the movement of sediment or alter the natural contour of the coastal wetland.” At the same time, the DEP Order allowed “bank and dune stabilization and coastal engineering structures which are otherwise approved under all applicable municipal, state and federal laws . . . where such structures will have no adverse effects on adjacent property or downcoast areas.”
*391 Between 1980 and 2000, several of the defendants sought to construct stone revetments to protect their properties from erosion.[13] Construction of a revetment required a G.L.c. 91 license (“License”) as well as approval under the Massachusetts Wetlands Protection Act (“WPA”)[14] and an Order of Conditions (“OOC”) under Wellfleet’s Wetland Protection Bylaw or a Super-ceding Order of Conditions (“SOOC”) under the WPA. The DEP and the Wellfleet Conservation Commission (“Commission”) issued several Licenses and OOCs/SOOCs, some of which contained special conditions ordering nourishment[15] of the revetments with sand. In most instances, the revetments were designed and constructed as separate projects by different engineers under individual contracts with landowners.

Bilodeau Revetment:

In 1993, Bilodeau filed a Notice of Intent (“NOI”) with the DEP to construct a coastal rock revetment on his property at 100 Second Avenue. On October 19, 1995, the Commission issued an OOC establishing special conditions to be met prior to construction of the Bilodeau revetment, including: removal of metal posts from the beach; maintaining the construction area free of excess rocks; documenting the staging and construction area by photographs; submitting a final construction protocol to interested parties; and obtaining written approval for access to neighbor John Collins’ beach. On October 25, 1995, Bilodeau received a construction permit from the Commission. Bilodeau hired engineering and land surveying firm Felco, Inc. to design, and EZ-DoZE-IT to construct the revetment. Following completion of the revetment, on June 5, 1997, the Commission provided Bilodeau a Certificate of Compliance (“Certificate”). The Commission did not specify any continuous conditions when issuing the June 5, 1997 Certificate.

Drew Revetment:

On April 7, 1988, the Drews filed an NOI with the Commission to build a revetment on their property at 80 Second Ave. On September 26, 1988, the Commission issued the Drews an OOC that contained several special conditions. Special conditions 6-9 provided:
6. The beach is to be renourished with sand of comparable grain size. No sand is to be taken elsewhere from the beach for the renourishment program.
7. The dune at the access point is to be restored and revegetated, and snowfencing is to be erected across the project access to inhibit passage.
8 . . . Beach grass is to be planted 16 inches on center alternatively . . .
9. A beach profile existing prior to construction of the revetment is to be sent to the Conservation Commission ... Thereafter, annually in September, the beach profile is to be sent to the Conservation Commission.
On March 21, 1991, following the completion of the Drew revetment, the Commission issued a Certificate, which required no continuing special conditions.

McLaughlin-Marino Revetment:

The McLaughlin-Marinos purchased their property, 114 Fourth Street, on November 12, 2004. The McLaughlin-Marino Property was recorded at the Barnsta-ble Registry of Deeds as lots 16, 17, and 18 of Block 48 in Plan Book 34 and did not include lots 14 and 15 upon which the revetments sits. After becoming aware that they did not own lots 14 and 15, on October 2, 2006, the McLaughlin-Marinos purchased lot 15, where the top portion of the revetment is located. The Massachusetts Audubon Society, which is not a party to this action, owns lot 14 where the lower part of the revetment is located. The revetment was constructed in approximately 1985, following the issuance of SOCC #SE-77-189 to the former owner of 114 Fourth Street, David Knight.

Moriarty Revetment:

On July 13, 1994, David Moriarty filed an NOI to build a rock revetment on their property at 35 Eighth Street. The Commission issued an OOC on October 18, 1994, that did not impose any requirement to renourish the proposed revetment. On June 5, 1997, the Commission provided the Moriartys a Certificate, which indicated that the work approved by the OOC had been satisfactorily completed.

Olive Revetment:

Charles Gasek, the former owner of the Olive Properly, filed an NOI on April 11, 1988, and obtained DEP license No. 9120 and OOC #SE-77-407 on November 1, 1987, for construction of a rock revetment. The OOC stated a special condition, that “the beach is renourished with sand of comparable grain size.” On March 21, 1991, Charles Gasek received a Certificate, which did not include continuing special conditions.
The Olives purchased 113 Fourth Street on January 6, 1998. On October 22, 1998, the Olives filed a NOI which proposed to reconstruct the existing revetment, which then looked like a pile of rocks rather than a wall. The Olives hired professional engineer Russell Perry to redesign the revetment. On July 28, 1999, the Commission issued the Olives an OOC and on November 24, 1999, the DEP issued a SOOC to the Olives. The SOOC included special condition #10, which provides: “The beach shall be nourished, as required, with compatible grain size in order to maintain the beach elevation depicted on the referenced plan [(2NGVD)] such that the toe stones are sufficiently buried.”
On November 27, 2001, the Olives obtained a License to reconstruct and maintain a stone revetment and an elevated platform, which did not contain any special conditions. On December 5, 2006, the DEP issued the Olives a Certificate, which stated that special condition #10 would remain as an ongoing condition. The Olives and Robert Perry have inspected *392 the toe stones of the revetment to make sure that they remain buried at 2NGVD. Until shortly before the motion hearing, the toe stones remained buried with an elevation of 3NGVD.[16]

B. Coastal’s Design, Permitting, and Supervisory Services

Coastal performed design, permitting, and construction supervision services in connection with three abutting revetments on the northern portion of Lieutenants Island (together the “Northern Segment”). The Northern Segment was constructed through the joint effort of David Knight (the predecessor to the Brimm Property), John and Frances Lundblad (predecessor to the Lieutenant Island Trust Properties), and the Armstrongs.[17]
Coastal performed its design, permitting, and construction supervision services for the Northern Segment in 1995. The Commission issued a Certificate for the Brimm revetment, which is the focus of the Woodses’ claims against Coastal, on July 18, 1996.[18] The WPA Licenses for each of the Northern Segment revetments required that the licensee submit “as-built” plans to the DEP and the Commission within sixty days of completion of the rock revetment. No plan was submitted to the DEP or the Commission within the allotted time. The DEP became aware of this deficiency on or about December 21, 2004 and requested the required as-built plans. Coastal submitted these plans on April 20, 2005. In the spring of 2005, the Woodses discovered that the as-built plans for the revetments on the Brimm and Lieutenant Island Trust properties were inconsistent with their original licenses. The Woodses allege that design or supervision flaws occurred during the construction of the Northern Segment causing a protrusion on the Lieutenant Island Property revetment and an overbuild of twenty to twenty-five feet of the Brimm revetment.
C. The Woodses’ Litigation History
A factual dispute exists as to the time at which the Woodses’ tort causes of action accrued. The parties present the following evidence as to the Woodses’ awareness of increased erosion on their property. On August 30, 2001, Dr. Woods wrote a letter to Stanley Humphries, his expert witness, in which he stated “(t]he placement of large stones . . . would lead to an increased erosion problem for me if they were the endpoints of the seawall.” On July 31, 2002, Dr. Woods wrote a letter to the Commission, stating “the erosion and scarping at the end of the wall facing my property had been accelerating at an alarming pace. During the month of July, we have seen multiple feet of erosion. The loss of my property to erosion is imminent.” A year later, on July 28, 2003, Dr. Woods sent Brimm a letter, which addressed a “design problem” with the Brimms’ proposal to extend their rock revetment toward the Woodses’ property.[19] The Woodses argue that they lacked knowledge that the defendants’ revetments were directly harming their property until 2005, based on the affidavit testimony of Stanley Humphries: “[i]n late 2005 or early 2006, the erosion of the Northern Dune [located in front of the Woodses’ property] began to directly damage the Woodses Property.”
On January 12, 2007, the Woodses commenced this lawsuit against the defendants. The Woodses filed their First Amended Complaint on February 21, 2008, adding Martin Reilly and Angela Rae Philbrook, Trustee of the Lieutenant Island Realty Trust, as defendants. The Woodses filed their Second Amended Complaint on November 3, 2008.

DISCUSSION

Summary judgment is properly granted when there is no genuine issue as to any material fact, and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A fact is material if it would affect the outcome of the case. A dispute of fact is genuine if the evidence would permit a reasonable fact finder to return a judgment for the non-moving party. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991). The moving party may prevail on its motion by demonstrating by reference to materials properly in the summary judgment record, unmet by countervailing materials, that the party bearing the burden of proof at trial has no reasonable expectation of proving an essential element of its case. Carey, 446 Mass. at 278, citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). To withstand summary judgment, the non-moving party must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that a genuine issue of fact exists. Mass.R.Civ.P. 56(e); Ng Bros. Con-str., Inc. v. Cranney, 436 Mass. 638, 644 (2002).
The Motion Defendants seek summary judgment on all of the Woodses’ claims. The Motion Defendants make the following arguments in support of their motions: (1) that the Woodses lack standing to enforce WPA regulations and consequently cannot maintain an action for trespass or negligence based on failure to nourish the revetments, Counts 2 and 4; (2) the statute of limitations bars all of the Woodses’ tort claims; (3) that no law or evidence exists to support the Woodses’ trespass, negligent construction and maintenance, and nuisance claims; and (4) that no actual controversy exists on which the court could issue a declaratory judgment.
Coastal asserts additional arguments, alleging that G.L.c. 260, §2B precludes the Woodses from maintaining tort claims against it. Coastal further argues that because the Woodses’ claims against it are barred by §2B, it cannot be held liable as a joint tortfeasor and the contribution and common-law indemnification claims against it must be dismissed. Coastal also argues that the Brimms, as incidental beneficiaries of David Knight’s contract with Coastal, lack standing to *393 pursue their contractual claim against Coastal. Finally, the McLaughlin-Marinos argue that they cannot be held liable for trespass, negligence, or nuisance where they do not own the land on which the revetment in front of their property is located. The court addresses the Motion Defendants’ and Coastal’s arguments with respect to standing, procedural time limits, and littoral rights below.

I. Standing

The motions before the court present two standing issues. First, the Motion Defendants challenge the Woodses’ standing to enforce special conditions issued by state and local agencies pursuant to the WPA. Second, Coastal challenges the Brimms’ standing to maintain breach of contract and breach of fiduciary duty claims pursuant to a contract under which they are third-party beneficiaries. For the following reasons, the court concludes that the Woodses lack standing to maintain a private action to enforce special conditions under the WPA and that the Brimms fail to show that they are intended beneficiaries to the contract under which they sue.
The Motion Defendants argue that Counts 2 and 4, captioned as “Intentional Tort — Failure to Conduct Beach Nourishment” and “Negligence — Failure to Conduct Beach Nourishment,” state claims to enforce special conditions, ordering nourishment of the revetments, contained in the Motion Defendants’ OOCs and SOOCs under the WPA. The Motion Defendants contend that the Woodses lack standing to enforce special conditions issued by the DEP or the Commission because the WPA does not create a private right of action by which the Woodses can enforce DEP orders.
Read reasonably, the court concludes that Counts 2 and 4 attempt to enforce special conditions related to beach nourishment included in the OOCs and SOOCs issued to the Motion Defendants.[20] The court’s examination of caselaw and the plain language of the WPA reveals that the Woodses lack standing under the WPA to enforce special conditions relating to nourishment of the Motion Defendants’ revetments. Our courts “have generally been reluctant to infer a private cause of action from a statute in the absence of some indication from the Legislature supporting such an inference.” See Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 543, 545 (1998) (reasoning that clear legislative intent is a determinative, if not necessaiy, factor to infer a private cause of action from a statute). Similarly, “when the Legislature has employed specific language in one part of a statute, but not in another part which deals with the same topic, the earlier language should not be implied where it is not present.” Boone v. Commerce Ins. Co., 451 Mass. 192, 197 (2008) (citations omitted).
The WPA’s plain language vests enforcement of §40 in the DEP, local conservation commissions, and state agents:
If the department of environmental protection finds that any proposed work would violate the provisions of chapter ninety-one, it shall proceed immediately to enforce the provisions of said chapter . . . [A] conservation commission and its agents, officers, and employees; the commissioner, his agents, and employees; environmental officers, and any officer with police powers may issue enforcement orders directing compliance with this section and may undertake any other enforcement action authorized by law.
Similarly, case law suggests that private parties cannot use orders issued by agencies pursuant to G.L.c. 131, §40 as the basis for private lawsuits. See Christoffels v. Alton Properties, Inc., 362 Mass. 862, 285 N.E.2d 453, 454 (Mass. 1972) (stating that the WPA “protects only the public interest and confers no enforceable rights on the plaintiffs”); see also Breneman v. U.S., 2003 WL 2203684 *3 (D.Mass. 2003) (the same).
Because the WPA provides no private right of action to enforce conditions issued by state or local agencies under the WPA, the Woodses cannot maintain their claims based on failure to conduct beach nourishment through a private suit.[21] As a result, Counts 2 and 4 are dismissed against all the defendants. The Woodses may nevertheless rely on the Motions Defendants’ alleged failure to conduct beach nourishment as evidence to support their remaining claims. See Berish v. Bornstein, 437 Mass. 252, 273 (2002) (“[ajlthough violations of a statute or regulations do not constitute negligence per se, they may provide evidence of negligence”).

B. Incidental vs. Intended Beneficiaries

A second standing issue arises as to the Brimms’ ability to maintain their contractual cross-claim, which alleges breach of contract and breach of fiduciary duty with respect to Coastal’s design and construction of the Brimm revetment. David Knight, the former owner of the Brimm property, entered into a contract with Coastal to build this revetment. Coastal asserts that the Brimms are incidental rather than intended, third-party beneficiaries of the Knight Contract and consequently lack standing to raise breach of contract and breach of fiduciary duty claims.
Under Massachusetts law, only intended third-party beneficiaries have standing to enforce contracts. Cumis Ins. Soc’y v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 464 (2009), citing Spinner v. Nutt, 417 Mass. 549, 555 (1994) (stating that “the plaintiffs must show that they were intended beneficiaries of the contract”). “It must appear from the language and circumstances of the contract that the parties to the contract clear(ly) and definitely]’ intended the beneficiaries to benefit from the promised performance.” Miller v. Mooney, 431 Mass. 57, 62 (2000), quoting Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366-67 (1997). The fact that the Brimms *394 derive a benefit from a contract created between David Knight and Coastal, standing alone, does not give them a right to sue based on the Knight Contract. See Spinner, 417 Mass. at 555-56.
Here, the Brimms fail to present evidence that the language or the circumstances surrounding the Knight Contract clearly and definitely intended to impart a benefit of a promised performance on them. Although the Brimms undoubtedly benefitted from the construction of the revetment, merely deriving an incidental benefit from the protection of the revetment does not elevate the Brimms to intended third-party beneficiary status under the Knight Contract. As a result, the Brimms cannot maintain their contractual cross-claims against Coastal.

II. Procedural Time Limits

General Laws c. 260, §§2A (Statute of Limitations) and 2B (Statute of Repose) establish time limits within which a party may bring tort actions arising out of improvements to real property. The Motion Defendants and Coastal argue that the Woodses’ claims are barred by the Statute of Limitations. Coastal also maintains that the Woodses’ and Cross-Claim Defendants’ claims are barred by the Statute of Repose. As a preliminary matter, the Woodses’ claims of intentional tort, negligence, and nuisance are all based in tort.[22]
The court’s review of the record shows that a genuine issue of material fact exists as to when the Woodses’ tort action accrued. This, in turn, creates a factual dispute as to whether the Woodses’ claims are time-barred by the Statute of Limitations. Even if the action is found by a jury to be time-barred under the discovery rule, the principle of continuing trespass/nuisance permits the Woodses to maintain their trespass and nuisance claims against the Motion Defendants despite limiting the Woodses’ recoveiy. Second, the undisputed facts of this case demonstrate that the Statute of Repose bars the Woodses’ and the Cross-Claim Defendants’ claims against Coastal.
A. Statute of Limitations
Coastal asserts that the Woodses discovered a “design problem” with the Brimms’ revetment out of which the Woodses’ claims arise on July 28,2003, over three years before filing this suit on January 12, 2007. The Motion Defendants also argue that the Statute of Limitations precludes the Woodses from raising any tort claims against them in connection with the construction and maintenance of their revetments.
According to the Statute of Limitations, “actions of tort. . . shall be commenced only within three years next after the cause of action accrues.” G.L.c. 260, §2A. A cause of action does not accrue under the Statute of Limitations until the plaintiff learns, or reasonably should have learned, that he has suffered harm as a result of the defendant’s conduct due to the operation of the discovery rule. Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990). “The discovery rule does not require that a plaintiff know the specific details pertaining to an alleged harm, but instead it imposes a ‘duly to investigate’ on a plaintiff who has cause for concern . . . Critically, knowledge of ‘every fact necessary to prevail on the claim’ is not required to put the plaintiff on inquiry notice and trigger the accrual period.” Epstein v. CR Bard, Inc., 460 F.3d 183, 188 (1st. Cir. 2006) (citations omitted). Here, starting on August 30, 2001, the Woodses wrote multiple letters to the Commission and neighboring landowners from which a jury could find that the Woodses knew or should have known that the neighboring revetments modified littoral currents, which caused increased erosion of the Woodses’ property. The Woodses, however, maintain that they were unaware of the harm until their property began to erode in 2005. Under the discovery rule, a genuine issue of material fact exists as to whether the Woodses’ cause of action accrued more than three years prior to the filing date, January 12, 2007.
Even if the Woodses filed their action after their cause of action accrued, the Statute of Limitations does not preclude the Woodses from maintaining their trespass and nuisance claims if these claims are based on continuing tortious or wrongful conduct, and the action is brought within three years of the end of the tortious or wrongful conduct. See Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 231-32 (2002) (permitting plaintiff “whose claim otherwise would be untimely to sue where its property rights are invaded from time to time because of repeated or recurring wrongs, resulting in new harm to the property on each occasion”). Continuing tortious or wrongful conduct does not exist where the harm caused to the plaintiff s property is the result of “a single encroachment resulting in permanent harm.” Compare Carpenter v. Texaco, 419 Mass. 581, 582 (1995) (finding no continuing trespass or nuisance where permanent harm to plaintiffs properly was caused by seepage of gasoline that had ceased more than three years prior to bringing suit), with Sixty-Eight Devonshire, Inc. v. Shapiro, 348 Mass. 177, 184 (1964) (water repeatedly pouring onto plaintiffs properly from neighbor’s gutter).
Here, the construction and maintenance of the Motion Defendants’ revetments allegedly caused continuing harm in the form of increased daily erosion of sand on the Woodses’ property. This alleged harm is analogous to water repeatedly pouring onto a landowner’s property, and consequently is properly characterized as a repeated or continuous, rather than permanent harm. Because this alleged harm occurs even at the present, under the principle of continuing trespass or nuisance, the Woodses’ trespass and nuisance claims withstand a Statute of Limitations challenge even if the jury determines that the Woodses knew or should have known of the harm prior to three years before filing this suit. Although the Woodses can maintain their action under those circumstances, the *395 Woodses’ recovery may be limited to the three-year period prior to filing this action. See Harrison v. Textron, Inc., 367 Mass. 540, 552 (1975); Murphy v. Chatham, 41 Mass.App.Ct. 821, 827 (1996) (limiting landowner’s damages for continuing nuisance to three years prior to filing action).

B. Statute of Repose (Coastal)

Coastal claims that Counts 1, 2, 3, and 5 of the Woodses’ Complaint are barred by the six-year time limit established by G.L.c. 260, §2B (“Statute of Repose”) . Coastal claims that it is a protected actor under the Statute of Repose, the revetment is an “improvement” within the meaning of §2B, and the Brimm revetment for which Coastal performed design services, permitting, and construction oversight services opened to use more than six years prior to the Woodses’ filing of this action on January 12, 2007. The Woodses dispute that revetments are improvements for §2B purposes and that six years have passed since the opening of the Brimm revetment to use.
General Laws c. 260, §2B provides in pertinent part:
Action of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property... shall be commenced only within . . . six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.

L Protected Actor

Coastal is a protected actor for the purposes of the Statute of Repose. Section 2B provides that those who render “design, planning, construction, or general administration” services in connection with real property are protected from liability associated with any deficiency or neglect. See Dighton v. Federal Pac. Elec. Co., 399 Mass. 687, 694 (1987) (stating that §2B defines a protected actor by reference to protected acts and does not specifically enumerate classes of protected actors). “[Section] 2B was not intended to apply to mere suppliers of standardized products, but only to kinds of economic actors who perform acts of ’’individual expertise" commonly thought to be performed by architects and contractors — that is to say, to parties who render particularized services for the design and construction of particular improvements to particular pieces of real properiy." Rosario v. MD Knowlton Co., 54 Mass.App.Ct. 796, 800 (2002), quoting Dighton, 399 Mass. at 696. Ambiguity may arise as to whether a party is a protected actor under §2B, if the party performs tasks common to both a supplier and an architect, engineer, or general administrator of a construction contract. Rosario, 54 Mass.App.Ct. at 801. Here, Coastal’s work along the Northern Segment, including the Brimm revetment, consisted of engineering, permitting, and construction supervision services particularized to the Motion Defendants’ properties. No ambiguity arises regarding Coastal’s status as a protected actor.
it Improvement
Similarly, the revetments are properly characterized as “improvements” for §2B purposes. An “improvement” is “a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.” Rosario, 54 Mass.App.Ct. at 800 (citations omitted) (reasoning that Massachusetts courts do not follow a rigid fixture analysis in interpreting the term “improvement”). Courts have characterized a broad variety of projects to property as “improvements.” See e.g. McDonough v. Marr Scaffolding Co., 412 Mass. 636, 640 (1992) (installation of bleachers to ice hockey rink); Parent v. Stone & Webster Eng’g Corp., 408 Mass. 108, 111 (1990) (installation of electrical distribution panel in electrical generation plant); Conley v. Scott Prods., Inc., 401 Mass. 645, 646-47 (1988) (addition of insulation to building); Anthony’s Pier Four, Inc. v. Crandall Dry Dock Eng’g, Inc., 396 Mass. 818, 823 n.8 (1986) (installation of mooring for ship next to waterfront cocktail lounge); Milligan v. Tibbetts Eng’g Corp., 391 Mass. 364, 368 (1984) (extension of road); Rosario, 54 Mass.App.Ct. at 800 (installation of hydraulic lift); Snow v. Harnischfeger Corp., 12 F.3d 1154, 1161 (1st Cir. 1993) (installation of crane at trash-to-energy plant).
Although no case has expressly recognized revetments as “improvements,” they fall within the broad category of projects Massachusetts courts have found to be “improvements.” No question arises that the coastal rock revetments are permanent additions to the Motion Defendant’s real property obtained as a result of an expenditure of money. Additionally, like in Conley, where insulation increased the function and value of a building by preventing heat from escaping, the revetments increase the value and function of the Motion Defendants’ beachfront property by preventing erosion of sand from their shores. The coastal rock revetments are therefore “improvements” to real property for §2B purposes.

iil Six-Year Time Limit

The court must last decide whether the Woodses commenced their action outside of the six years after the earlier date between “(1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.” G.L.c. 260, §2B. As advanced by Coastal, the construction of a revetment on real property does not comport with “taking of possession for occupancy by the owner”; therefore, the court looks instead to the “opening of the improvement to use” to determine the commencement of the six-year Statute of Repose. See Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng’rs, Inc., 45 Mass.App.Ct. 120, *396 125 (1998) (stating that “the question whether an improvement has been substantially completed is immaterial to the determination of the date on which the statute of repose begins to run if the improvement has already been opened to use”). In Coca-Cola Bottling Co. of Cape Cod, the court reasoned that the wastewater plant had been opened to use when it started operating, even though this occurred prior to the plant coming substantially and fully in compliance with regulations. Id.; see also Agri-Mark, Inc. v. Niro, Inc., 214 F.Sup.2d 33, 41 (D.Mass. 2002) (reasoning that upgrade to existing evaporation system can be considered open to use only if it can be used for the upgraded service for which it was designed). Here, the Brimm revetment was available to be used for its designed purposes at the latest when the DEP and the Commission issued a Certificate on July 18, 1996. Because the Certificate was issued more than six years prior to the filing of this action, the Statute of Repose bars the Woodses’ claims against Coastal.

iv. Coastal’s Contribution & Indemnification Liability

Coastal contends that because it cannot be held liable for its work associated with the Brimm revetment, the Cross-Claim Defendants cannot hold it liable for claims of contribution and indemnification. The court agrees that Coastal is entitled to judgment as a matter of law on the Cross-Claim Defendants’ contribution claims. See G.L.c. 23IB, §1 (“[t)he right to contribution shall exist only in favor of a joint tortfeasor”); Dighton, 399 Mass, at 691-92 (stating “without liability in tort, there is no right to contribution”); Montaup v. Ohio Brass Corp., 561 F.Sup. 740, 748 (D.R.I. 1983) (analyzing G.L.c. 260, §2B) (concluding that no liability existed in contribution for defendant protected by the Statute of Repose).
Coastal is also entitled to summary judgment as to the Cross-Claim Defendants’ indemnification claims. A right to indemnification arises under three circumstances: (1) where an express contract provides for indemnification; (2) where indemnification is implied from the contractual relationship of the parties; and (3) where the common law creates indemnification because a party is exposed to liability due to the negligent act of another. Rathburn v. Western Mass. Elec., 395 Mass. 361, 363-65 (1985); Decker v. Black & Decker Manuf. Co., 389 Mass. 35, 37-41 (1982). If contractual indemnification exists, the Cross-Claim Defendants may maintain indemnification claims against Coastal despite the operation of the Statute of Repose. See Gomes, 406 Mass. at 648. Here, nothing in the summary judgment record or in the parties’ cross-claims demonstrates that the Cross-Claim Defendants entered into an express contract or any other contractual relationship with Coastal from which the court could imply a contractual right to indemnification. As to common-law indemnification, this theory of recovery is only available to one who is “without fault, [and] compelled by operation of law to defend himself against the wrongful act of another.” Thomas v. EDI Specialists, 437 Mass. 536, 543 (2002). The undisputed facts here show that the Cross-Claim Defendants participated in, and consequently can potentially be held at fault, with respect to the construction and the maintenance of their revetments. See Montaup Elec. Co., 561 F.Sup. at 748-49. The Cross-Claim Defendants cannot recover against Coastal based on common-law indemnification.

III. Littoral Owners’ Rights

The Woodses bring trespass, negligence, and nuisance claims against their neighbors for the construction and maintenance of revetments on their properties. The Motion Defendants acknowledge that the Woodses may bring a claim for private nuisance; however, they argue that Massachusetts law does not provide littoral owners a cause of action for trespass or negligent construction and maintenance of an erosion control measure. Should the court find otherwise, the Motion Defendants contend that the Woodses have not presented evidence of any nuisance, negligence, or trespass associated with constructing or maintaining their revetments.
“Throughout history, the shores of the sea have been recognized as a special form of property of unusual value; and therefore subject to different legal rules from those which apply to inland properly.” Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629, 631 (1979). Massachusetts courts and the Legislature have generated a body of “riparian” and “littoral” law which establishes the rights and obligations of owners of properly bordering rivers, streams, lakes, and the ocean.[23]
Although Massachusetts riparian law dealing with surface and groundwater rights is well-developed, see generally Lee P. Breckenridge, Massachusetts Waters and Water Rights §6 (2009), few cases address littoral rights, see Lummis v. Lilly, 385 Mass. 41, 45 (1982) (recognizing that Massachusetts “jurisprudence on the rule governing littoral rights is not abundant”). Cases dealing with littoral rights have primarily discussed private versus public rights, rather than disputes among private littoral owners. Id.[24] More recently, however, the Supreme Judicial Court provided some clarification as to private littoral rights, suggesting that courts can draw from riparian law when examining disputes over littoral rights, by stating that the common-law doctrine of reasonable use applies to littoral owners to the same extent as to riparian owners. See Lummis, 385 Mass, at 46 (“[t]here is no sound reason for imposing the obligation of reasonable use on riparian owners, while permitting littoral owners to use their property without limitations”).
The Lummis case involved a lawsuit based on nuisance, unreasonable use, and unjust enrichment between Lummis and Lilly, a neighboring littoral *397 landowner who had obtained a state license and subsequently installed a stone groin on his waterfront property to prevent its erosion. Id. at 41-42. Although the Supreme Judicial Court did not decide the case on the merits, it rejected the application of the common enemy rule[25] and extended the reasonable use rule to a private dispute involving littoral rights. Id. at 46. In doing so, the Lummis Court listed factors by which to measure whether a littoral owner’s use of land is unreasonable: whether the conditions of a license from state agencies had been met (although this is not conclusive evidence of reasonable use),[26] “the purpose of the use, the suitability of the use to the water course, the economic value of the use, the social value of the use, the extent and amount of harm it causes, the practicality of avoiding the harm by adjusting the use or method or use of one owner or the other, the practicality of adjusting the quantity of water used by each owner, the protection of existing values of water uses, land investments, and enterprise, and the justice of requiring the user who is causing harm to bear the loss.” Id. at 46-47.[27]
The Woodses argue that the reasonable use rule expressed in Lummis creates a common-law duty upon which the Woodses can base their claims for trespass, negligence, and nuisance. The court finds no support for a common-law duty of reasonable use as such; however, a broad reading of Lummis and other cases describing rights extending to riparian owners suggest that littoral landowners can maintain private nuisance, negligence, and trespass claims relating to littoral rights.[28]

A. Nuisance

Whether the Motion Defendants acted reasonably in constructing and maintaining their revetments is a genuine issue of material fact for the jury to consider. A private nuisance arises where a property owner “creates, permits, or maintains a condition ... on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another.” Asiala v. Fitchburg, 24 Mass.App.Ct. 13, 17 (1987). As stated above, under Lummis, the private nuisance theory of recovery is available to littoral owners affected by neighboring landowner’s erosion control measures, and factors considered relevant to reasonable use in the riparian context can be considered in evaluating the standard with respect to littoral rights. Id. at 46; see also Von Hennenberg v. Generazio, 403 Mass. 519, 523 (1988) (reasoning that focus of the reasonable use rule is not just the landowner’s action, but also its affect on the other landowner’s property, such that landowner can be held liable for discharge or blockage of water from another’s land); Trenz v. Town of Norwell, 68 Mass.App.Ct. 271, 275-80 (2007) (refining reasonable use standard in riparian rights context to include consideration of whether harm to neighbor is substantial and whether landowner can avoid harm in part or on the whole without undue hardship). The pertinent question here is whether the Motion Defendants’ construction and maintenance of revetments unreasonably harmed the Woodses’ properly by blocking or changing the natural flow of sand and water.

B. Negligence

The Woodses argue that the theory of negligence, which has been applied to the rights of riparian owners in the presence of the harmful flow of surface water caused by a neighboring landowner’s negligent conduct, applies to the rights of littoral owners with respect to the harmful affect of modified ocean currents and the movement of sand caused by a neighboring landowner’s negligent construction and maintenance of a revetment.
“The elements of a claim of negligence, generally, are (1) negligence, that is, ‘the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinaiy caution and prudence ought to exercise under the particular circumstances’; (2) the causal connection between the defendant’s negligence and the plaintiffs injury or damage; and (3) damages.” Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 221-22 (2009) (internal citations omitted). Negligence has been recognized in at least one case since the adoption of the reasonable use rule in Massachusetts water rights law. See DeSanctis, 423 Mass, at 112-15 (concluding that defendant municipality had failed to use reasonable care in maintaining wellhole and adjoining piping causing damage to plaintiffs property, but plaintiffs recovery was barred by comparative/contributory negligence statute, G.L.c. 231, §85). In DeSanctis the Court referred to plaintiffs “independent cause of action for negligent trespass” (independent vis a vis DeSanctis’s claim for nuisance). The DeSanctis Court dealt with negligent trespass as a variety of negligence to which comparative negligence applied and arguably blurred the distinction between negligent trespass and classic negligence as separate causes of action.
The evidence in the record does not support any design flaw or structural integrity issue specific to the Motion Defendants’ revetments; however, the Woodses’ expert affidavits support their assertion that “all the Residents are bound, by a duty of reasonable care to downdrift property owners, to perform shoreline renourishment sufficient to replenish the sand and sediment that otherwise would have been provided by the ongoing erosion of their properties” and that the Motion Defendants breached this duty, causing increased erosion to the Woodses property. The Woodses therefore raise factual issues as to the existence of a duty and the *398 negligent maintenance of the Motion Defendants’ revetments. Whether reasonable care for a revetment includes beach nourishment and whether the Motion Defendants’ alleged failure to nourish their revetments can be causally connected to the increased erosion on the Woodses’ property are questions for the jury to consider within the framework of a classic cause of action for negligence under Count 3. Negligent trespass is best considered under Count 1, to which we now turn.
C. Intentional Tort (Trespass)
Massachusetts law and that of other jurisdictions recognizes that riparian landowners may maintain actions for intentional trespass concerning water rights. To maintain a claim for trespass, a landowner must demonstrate a physical entry by the defendant or an instrumentality within the defendant’s control, such as water. See e.g. Trenz, 68 Mass.App.Ct. at 271-72 (where landowner brought claim of trespass against defendant municipality for allowing water to discharge from its culverts onto plaintiff’s property); Sixty-Eight Devonshire, Inc., 348 Mass. 177 (water flowing from a broken gutter onto plaintiff's building); Grundy v. Brack Family Trust, 151 Wash.App. 557, 569-70 (2009) (allegedly raising seawall and causing sea water to flow onto plaintiffs property).
“A landowner who sets in motion a force which, in the usual course of events, will damage the property of another is guilty of a trespass on such property.” Krasnecky v. Meffen, 56 Mass.App.Ct. 418, 424 (2002) (finding no intent where defendant’s dogs entered plaintiffs land and killed sheep, where the evidence did not disclose the distance between the properties and how the dogs got on the plaintiffs land), citing Sheppard Envelope Co. v. Arcade Malleable Iron Co., 335 Mass. 180, 187 (1956); see also Grundy, 151 Wash.App. at 569-70 (even if littoral owners intentionally raised their bulkhead, causing seawater to flood their neighbor’s land, such conduct did not satisfy intent element of trespass). Here, the record is devoid of any evidence supporting a claim that the Motion Defendants intentionally set into motion events that in the usual course would cause the Woodses harm by depriving them of the use of their property through direct invasion of water or otherwise. The mere decision to build a revetment does not demonstrate the intent required to support an intentional trespass claim. As a result, the Woodses’ actions for intentional trespass cannot withstand summary judgment, but that does not end our analysis.
A complaint seeking relief for an intentional trespass adumbrates a claim for a negligent trespass. Porter v. Clarendon National Insurance Co., 76 Mass.App.Ct. 655, 660 (2010), citing J. D'Amico, Inc. v. Boston, 345 Mass. 218, 224 (1962). The case of Sheppard Envelope, 335 Mass. at 187, states, with regard to the emission of particles from a smoke stack that:
The defendant whether negligently or otherwise released a substance which might lodge anywhere that favorable winds might carry it. A landowner who sets in motion a force which, in the usual course of events, will damage the property of another is guilty of a trespass on such property.
More recently, the DeSanctis Court stated, “A plaintiff may recover under the theory of negligent trespass if the jurors determine that the defendant was negligent and that the defendant’s negligent entry onto the plaintiffs land caused the plaintiff harm.” (Citing Restatement (Second) of Torts §165 (1965), DeSanctis, 423 Mass. at 118. No doubt genuine issues of material fact abound which, after trial, may weigh against a claim of negligent trespass but at this juncture plaintiffs may proceed on such a theory.[29]
D. McLaughlin-Marino Revetment
Finally, a question exists as to the ownership of the revetment in front of the McLaughlin-Marinos property and, in turn, their potential liability in nuisance or negligence. The Woodses assert that the McLaughlin-Marinos own the area on which the revetment is located by prescription. Genuine issues of material fact exist as to the ownership of lot 14, and consequently whether McLaughlin-Marino can be held liable for torts with respect to the revetment located on that property. See Boothroyd v. Bogartz, 68 Mass.App.Ct. 40, 44 (2007) (“As codified in G.L.c. 187, §2, a claimant may be entitled to a prescriptive easement respecting the land of another if it is shown by clear proof of a use [by claimant or predecessors in title] of the land in a manner that has been (a) open, (b) notorious, (c) adverse to the owner, and (d) continuous or uninterrupted over a period of no less than twenty years”).[30]

VI. Declaratory Judgment

The Woodses seek a declaratory judgment entitling them to injunctive relief in the form of an order requiring the Motion Defendants to: (1) restore the Woodses’ property to pre-revetment conditions; (2) modify the revetments to eliminate the effects of erosion to the Woodses’ property; and (3) conduct ongoing beach nourishment to maintain the Woodses’ property in its pre-revetment condition.
Under G.L.c. 231A, §1, this court may make a declaratory judgment “either before or after a breach or violation thereof has occurred in any case in which any actual controversy has arisen . . .”[31] To maintain an action for declaratory judgment, a party must demonstrate the existence of (1) an actual controversy in the pleadings and (2) legal standing. Id., citing Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 292 (1977). “An actual controversy exists where there is a *399 real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest, and the denial of such assertion by another party also having a definite interest in the subject matter . . .” Gay & Lesbian Advocates & Defenders v. Attorney General, 436 Mass. 132, 134 (2002) (quotations omitted).
No actual controversy exists in this case. The Woodses do not assert that they have a definite interest in a legal right, such as the accretion of sand along the coastline of their property, nor do the Motion Defendants maintain the opposite position by denying that the Woodses have an interest in the accretion of sand or claiming that they have a right to eliminate the movement of sand down the coastline. Even if the parties could arguably satisfy actual controversy and standing requirements, the court would not enter a declaratory judgment in the form of the requested injunctive relief because such judgment would not establish the parties’ littoral rights and would fail to terminate the uncertainty giving rise to the proceeding. See G.L.c. 231A, §3. In any event the count is superfluous. Every aspect of relief sought is subsumed in the nuisance claim. See Hunneman Real Estate Corp. v The Norwood Realty, Inc., 54 Mass.App.Ct. 416, 429 fn 19 (2002); North American Expositions Co. Ltd. v Corcoran, 452 Mass. 852, 868 (2009). The court’s ruling here ‘does not imply that injunctive relief would not be available to the Woodses should they prevail on their nuisance claim.

ORDERS FOR JUDGMENT

It is ORDERED that Bilodeau, the Drews, the McLaughlin-Marinos, the Moriartys, and the Olives’ Motions for Summary Judgment (Docket #254, 255, 258, 256, and 257) be ALLOWED as to Counts 2, 4, and 6, ALLOWED as to so much of Count 1 as alleges an intentional trespass, and DENIED as to Counts 3 and 5 of the Woodses’ Second Amended Complaint (Docket #171). Whether the Motion Defendants’ construction and maintenance of their revetments caused a private nuisance or a negligent trespass, whether the Motion Defendants were negligent in maintaining their revetments, the date when the Woodses’ action accrued under the Statute of Limitations, and the McLaughlin-Marinos’ liability for the revetment on lot 14 remain genuine issues of material fact for the jury to decide at trial.
2. It is ORDERED that Coastal’s Motion for Summary Judgment (Docket #245) be ALLOWED as to Counts 1,3,5, and 6 of the Woodses’Second Amended Complaint (Docket #171), and ALLOWED as to the Cross-Claims of the Armstrongs, the Brimms, Bilodeau, Collins, the Drews, the McLaughlin-Mari-nos, the Moriartys and the Olives (Docket #10, 9, 11, 13, 22, 130, 12, 26).
*400 The proposal in front of you is to counter the inaction for seven years of all the seawall licencees [sic] along the western side of Lieutenant Island: They have ignored local and state mandates to renourish in front of their seawalls. Since renourishment was a condition agreed to by the licencees [sic] of the seawalls, and since the erosion is enhanced as a result of a design problem and a lack of renourishment by all the seawall owners, it would seem most fair if the burden of the renourishment of the end scarp adjacent to the Brimm property would be bom by all seawall owners on the western side of the island.

 Rock revetments consist of large rocks held in place by metal bars.

 Docket #171.

 At the April 12, 2010 hearing, counsel for the Woodses clarified that the Second Amended Complaint does not state claims for trespass and negligence based on failure to conduct beach nourishment against Coastal.

 Similarly, in their opposition to the Bilodeau motion, the Woodses state that trespass “is the intentional tort most directly applicable in this case.”

 See, the Armstrongs’ Cross-Claim (Docket #10), the Brimms’ Cross-Claim (Docket #9), the Bilodeau Cross-Claim (# 11 & #95), the Collins Cross-Claim (Docket # 13), the Drews’ Cross-Claim (Docket #22), the McLaughlin-Marinos’ Cross-Claim (Docket #130), the Moriartys’ Cross-Claim (Docket #12), and the Olives’ Cross-Claim (Docket #26).

 Docket #239.

 Docket #62-69.

 Bilodeau Motion for Summary Judgment (Docket #254), Coastal Motion for Summary Judgment (Docket #245), the Drews’ Motion for Summary Judgment (Docket #255), the McLaughlin-Marinos’ Motion for Summary Judgment (Docket #258), the Moriartys’ Motion for Summary Judgment (Docket #256), and the Olives’ Motion for Summary Judgment (Docket #257). During the hearing on April 9, 2010, counsel for the Armstrongs moved for summary judgment by reference to the arguments made by the Motion Defendants. Counsel for the Woodses objected, arguing that there may be facts unique to the Armstrong property. While this jurist expressed scepticism at plaintiffs’ objection, the court denied the Armstrong’s motion but stated that a formal written motion for summary judgment would be considered in due course. Given the broad application of the principles in this decision to all of the defendant property owners, judicial economy requires that such a motion by the Armstrongs be set for hearing before this jurist.

 “Erosion” is defined as “the gradual eating away by current or tide of the soil of a riparian or littoral owner” that “may result in the loss of title to the land occupied by water.” 65 C. J. S., Navigable Waters §101 (2000 & Supp. 2008). Accretion is defined as the reverse of erosion, id., the “addition of solid material... to riparian [or littoral] land gradually and imperceptibly made by the water to which the land is contiguous.” Id. at §94.

 “There is well-settled authority for the proposition that littoral (shoreline) boundaries are not fixed, because natural processes of accretion or erosion change them . . .” Bergh v. Hines, 44 Mass.App.Ct. 590, 592 (1998).

 The intended purpose of a rock revetment is to stop erosion of the coastal bank and shoreline where the revetment is placed.

 Licenses are required when a landowner desires to construct an erosion control measure below the mean high water line.

 Nourishment is the placement of sand on a revetment to maintain the pre-revetment elevation of the coastline and to keep the toe stones of the revetment from becoming exposed.

 At the April 9 and 12, 2010 hearing, the Olives’ counsel stated that the elevation may have changed and fallen out of *400 compliance with special condition #10 due to recent storm activity.

 Coastal also redesigned the existing revetment on the Olives’ property.

 The Second Amended Complaint suggests that the only claims against Coastal pertain to construction and maintenance of the rock revetment on the Brimm property.

 Dr. Woods stated the following in his July 28, 2003, letter to the Brimms:

 Under Count 2, the Woodses’ claim that the Motion Defendants “intentionally and unreasonably failed to conduct beach nourishment activities, in violation of regulatory permits, licenses, and orders; where applicable, which resulted in damages to Plaintiffs property.” Similarly, under Count 4 the Woodses claim that the Motion Defendants “negligently and unreasonably failed to conduct beach nourishment activities, in violation of regulatory permits, licenses and orders, where applicable, which resulted in damages to property.” Count 2 and 4 are properly characterized as claims attempting to enforce conditions under the WPA where the Woodses bring claims for trespass and negligence relating to construction and maintenance of the revetments and support these claims with the same evidence relied on under Counts 2 and 4. If not read in this manner, Counts 2 and 4 become duplicative of Counts 1 and 3.

 The court is aware that the Woodses have filed another lawsuit (Civil Action No. 07-099) seeking to have the Commission and the DEP enforce the special conditions included in the Motion Defendants’ permit.

 Massachusetts law recognizes both trespass and nuisance as common-law torts to properly. See Amaral v. Cuppels, 64 Mass.App.Ct. 85, 90-91 (2005) (stating “that trespass is an invasion of the plaintiffs interest in the exclusive possession of his [or her] land, while nuisance is an interference with his [or her] use and enjoyment of it”).

 See 65 C.J.S, Navigable Waters §82 (2000 and 2008 Suppl.) (suggesting that “the distinction between the terms ’riparian’ and ’littoral’ may be immaterial to the determination of a particular case, and the phrase ’riparian owner’ is used more generally to refer to a person who holds title to land abutting any body of water”).

 See Opinion of the Justices, 383 Mass. 895 (1981); Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629 (1979); Opinion of the Justices, 365 Mass. 681 (1974); Michaelson v. Silver Beach Improvement Ass'n, 342 Mass. 251 (1961); Butler v. Attorney Gen., 195 Mass. 79 (1907). But see Jubilee Yacht Club v. Gulf Ref. Co., 245 Mass. 60 (1923) (discussing private action where plaintiff sought injunctive relief from harm caused by defendants’ breakwater, but applying common enemy rule rejected by current jurisprudence in reaching result).

 In Tucker v. Badoian, the Supreme Judicial Court redefined the law applicable to riparian property owners’ water rights by rejecting the property owner-friendly common enemy rule and accepting a more flexible approach, the reasonable use doctrine. 376 Mass. 907, 916-19 (1978) (Kaplan, J., concurring).

 “It is settled that a license does not immunize the licensee from liability for negligence or nuisance which flows from the licensed activity.” Lummis, 385 Mass. at 47. (Citations omitted.)

 In Backman v. Lilly, 1992 WL 12151916 at *1 (Mass. Land. Ct. 1992), the Massachusetts Land Court resolved the controversy over the Lillys’ installation and maintenance of a groin along their beachfront properly. In that action, Back-man waived his right to damages and sought only injunctive relief consisting of removal of the Lilly groin. Id. at *5. After reviewing the evidence and expert testimony, the court found that the Lillys’ use of their land was reasonable and that Backman had failed to prove that Lillys’ groin was the proximate cause of the damage to the Backman properly. Id.

 The Woodses misinterpret the subtle interplay between the theories of trespass, negligence, and nuisance, which are commonly relied upon in cases involving riparian rights. See DeSanctis v. Lynn Water & Sewer Commission, 423 Mass. 112, 112-13 (1996) (distinguishing plaintiffs claims of intentional and negligent trespass and private nuisance, where landowner alleged that the defendant caused or permitted water to flow from the adjoining pipes and structure of a wellhole reservoir onto plaintiffs land over an extended period of time). While negligence often forms the basis of a nuisance claim, nuisance can exist without negligence. Compare Asiala v. Fitchburg, 24 Mass.App.Ct. 13, 15-18 (1987) (affirming decision that defendant municipality created private nuisance by negligently failing to construct and maintain a proper retaining wall causing injury to private landowner) with United Elec. Light Co. v. Deiso Constr. Co., 315 Mass. 313, 320 (1943) (stating “[a] nuisance might exist in the absence of negligence”) and Bern v. Boston Consol. Gas Co., 310 Mass. 651, 654 (1942) (same). The negligence in DeSanctis and Asíala applied to the common-law duty of reasonable care with respect to construction and maintenance of a wellhole and a retaining wall, rather than the common-law duty of reasonable use that the Woodses propose. Similarly, trespass, a direct invasion depriving a landowner of exclusive possession of property, has been mistaken for nuisance, the unreasonable interference with a landowner’s use and enjoyment of property. See Trenz v. Town of Norwell, 68 Mass.App.Ct. 271, 271-72 (2001) (wherein the trial court analyzed case in terms of nuisance, denying landowner’s claim of trespass).

 Queiy whether defendants released any force upon plaintiffs’ land. The plaintiffs rely on the fact that the revetments prevent sand from the defendants’ dunes and coastal banks from reaching the beach and then being transported by natural forces to the forefront of plaintiffs’ land. Arguably the real fault is the defendants’ failure to release sand. The facts regarding the geologic processes are complex and require a trial. In the final analysis proximity may be an issue á la Krasnecky, 56 Mass.App.Ct. at 424.

 The court is not persuaded by the Woodses’ argument that even if the McLaughlin-Marinos do not own lot 14, they could still be found liable for failure to nourish the top of the revetment under negligence, Count 3.

 See Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 705 (2002) (stating that the purpose of declaratory judgment “is to provide a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status, and other legal relations”). Declaratory judgment proceedings “are concerned with resolution of real, not hypothetical, controversies; the declaration issued is intended to have an immediate impact on the rights of the parties.” Galipault v. Wash Rock Invs. LLC, 65 Mass.App.Ct. 73, 84 (2005) (citations omitted).