SUPREME JUDICIAL COURT 
 
 ANNE WEISS[1] vs. PRESIDENT AND FELLOWS OF HARVARD COLLEGE (and eleven consolidated cases[2])

 
 Docket:
 SJC-13688
 
 
 Dates:
 February 10, 2025 – October 6, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, & Georges, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Uniform Anatomical Gift Act. Statute, Construction. Practice, Civil, Motion to dismiss. Words, "Peculiarly pervasive noncompliance."
 
 

             Civil actions commenced in the Superior Court Department on June 16, 28, and 29, 2023; July 13 and 18, 2023; August 14, 2023; September 5, 2023; October 2 and 19, 2023; November 16 and 27, 2023; and December 14, 2023.
            Motions to dismiss were heard by Kenneth W. Salinger, J.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Jeffrey N. Catalano (Kathryn E. Barnett, of Tennessee, Jonathan D. Sweet, Leo V. Boyle, & Chelsea Bishop also present) for the plaintiffs.
            Martin F. Murphy (Joan A. Lukey also present) for the defendants.
            Erin K. Higgins, Christopher K. Sweeney, & Ryan O. Forgione, for Joan and Sanford I. Weill Medical College and Graduate School of Medical Sciences of Cornell University, amicus curiae, submitted a brief.
            KAFKER, J.  In a macabre scheme spanning several years, Cedric Lodge, the person responsible for the care of cadavers at the Harvard Medical School morgue, dissected, stole, and sold parts of the bodies of individuals who donated their remains for research purposes.  After the public unsealing of his Federal criminal indictment, forty-seven plaintiffs, all relatives of individuals whose remains were potentially mishandled and sold, sued the President and Fellows of Harvard College (Harvard); Mark F. Cicchetti, the managing director of the Harvard Medical School Anatomical Gift Program (AGP or program); and Tracey Fay, the manager of the AGP, for various causes of action.
            A judge of the Superior Court dismissed the complaints against all three defendants, finding that they were entitled to the "good faith" defense under the Uniform Anatomical Gift Act (UAGA or act) and therefore not liable.  See G. L. c. 113A, § 18 (a).  We conclude that the plaintiffs alleged sufficient facts to plausibly suggest that Harvard and Cicchetti, but not Fay, failed to act in good faith as required by the UAGA.  Accordingly, we hold that the allowance of the motion to dismiss was improper as to those two defendants and reverse in part.[3]
            Background.  1.  Overview of the UAGA.  The UAGA governs "anatomical gift[s]," defined as "donation[s] of all or part of a human body to take effect after the donor's death for the purpose of transplantation, therapy, research or education."  G. L. c. 113A, § 2.  The act, which was approved by the National Conference of Commissioners on Uniform State Laws in 1968, was adopted by the Legislature in 1971.[4]  The act regulates the donation process from arranging an anatomical gift, to the procurement process, to the disposition of the remains after use.  See G. L. c. 113A, §§ 1-25.
            The purpose of the act is to "'encourage the making of anatomical gifts' by eliminating uncertainty as to the legal liability of those authorizing and receiving anatomical gifts, while respecting dignified disposition of human remains."  Carey v. New England Organ Bank, 446 Mass. 270, 272 (2006), quoting Prefatory Note to UAGA (1968), 8A U.L.A. 71 (Master ed. 2003).  Relevant here, and as discussed in further detail infra, the act includes a "good faith" provision, which provides that "[a] person who acts in accordance with this chapter . . . or who attempts in good faith to do so, shall not be liable for the act in a civil action, criminal prosecution or administrative proceeding."  G. L. c. 113A, § 18 (a).
            2.  Factual and procedural history.  "We summarize the factual allegations set forth in the complaint[s] and in the undisputed documents incorporated by reference . . . ."  Osborne-Trussell v. Children's Hosp. Corp., 488 Mass. 248, 250 (2021).  We reserve certain details for later discussion.
            a.  The anatomical gift program.  Since the 1960s, Harvard has operated an AGP through the Harvard Medical School.  As relevant here, the program facilitates the procurement and use of bodies gifted to Harvard for medical education, teaching, and research.  Harvard maintains an onsite morgue where the donated bodies are stored before and after they are used for educational or research purposes, until final disposition.  Remains are typically cremated and either returned to the donor's family if specified in the donation agreement or interred in a designated cemetery in Tewksbury, Massachusetts.
            At all relevant time periods, Harvard maintained a staff of three full-time employees to operate the AGP and its onsite morgue.  Cicchetti, the managing director of the AGP, "ha[d] supervisory, technical, administrative, financial, and compliance-related responsibilities."  In this role, Cicchetti, a licensed embalmer, also performed the embalming of donated remains and matched specimens with an appropriate educational use.
            Fay, the manager of the AGP, primarily carried out administrative tasks and managed all communications with the donor and the donor's next of kin during the registration process, at the time of the donor's death, and after the AGP's receipt of the donor's remains.  Although Fay's formal job description referenced "duties in preservation and technical morgue-based operations," she was "rarely in the morgue and [did] not fulfill such responsibilities" in practice.  Cicchetti and Fay also alternated weeks "on call" to assist donors' families and perform suitability screenings when a donor passed away outside of normal working hours.
            Lodge was responsible for the care, tracking, and handling of cadavers including "preparing for and intaking anatomical donors' bodies, coordinating embalming, [and] overseeing the storage and movement of cadavers to and from teaching labs."[5]  When a specific cadaver was no longer needed for study, Lodge prepared the remains for transport to an outside crematorium and, when appropriate, for burial.
            The AGP staff operated under the following supervisory structure:  both Fay and Lodge reported to Cicchetti, who in turn reported to a senior director for finance and administration in Harvard Medical School's program in medical education.  The AGP facility is located "on the [Harvard Medical School] campus[,] with lab and office space spread across different floors in the same building."  Within that building, Cicchetti's and Fay's offices were located in an administrative area, while Lodge used a workspace "in or near the embalming area."
            b.  Criminal allegations.  On June 14, 2023, the United States Attorney's Office for the Middle District of Pennsylvania unsealed an indictment against Lodge, his wife, and two coconspirators, alleging that the four participated in a criminal conspiracy from 2018 to March 2023 to steal human body parts from the Harvard morgue and sell them to buyers across the country both in person and online.  See United States vs. Lodge, U.S. Dist. Ct., No. 4:23-CR-00159 (M.D. Pa. June 13, 2023).[6]  As outlined in the indictment, Lodge stole dissected portions of donated cadavers, including heads, brains, skin, bones, and other human remains, and transported them to his home in New Hampshire.  From there, Lodge and his wife sold the stolen body parts to buyers, including the two alleged coconspirators, with whom they communicated via social media websites and cell phones.
            Lodge also allowed third parties unauthorized access to the morgue in order to select body parts for purchase.  For example, alleged coconspirator Katrina Maclean agreed to meet Lodge at the Harvard morgue at 1 P.M. on Wednesday, October 28, 2020, to purchase two dissected faces for $600.  Lodge also assisted Maclean with finding human skin to provide to a third party in exchange for his services tanning other human skin into leather.  Coconspirator Joshua Taylor sent thirty-nine electronic payments, totaling over $37,000, to a PayPal account operated by Lodge's wife, including a $1,000 transaction with the memo "head number 7" and a $200 transaction with the memo "braiiiiiins."
            While employed by Harvard during the period in which he was dissecting, removing, and selling donated body parts for profit, Lodge commuted to work in a car with a license plate that stated, "Grim-R."  For undisclosed reasons, Lodge was on employment leave from Harvard on two occasions:  (1) from September 1, 2021, to February 27, 2022; and (2) from February 14, 2023, two weeks before Harvard claimed to have been aware of Lodge's conduct, until his termination on May 6, 2023.
            c.  Harvard's response to the indictment.  The Federal Bureau of Investigation (FBI) contacted Harvard in March 2023 to disclose the pending investigation of Lodge and request that Harvard maintain the investigation's confidentiality until indictments issued and arrests were made.  Because Lodge was on a leave of employment that began in February 2023, he was not on campus at the time Harvard purportedly learned of the investigation.  Harvard immediately suspended both Lodge's email account and his campus access.  Lodge was later terminated "when adequate information from the [F]ederal investigation was provided to [Harvard] to justify [Lodge's] termination for cause."
            On June 14, 2023, after the Federal indictment was unsealed, Harvard sent a message to the Harvard Medical School and Harvard School of Dental Medicine communities regarding Lodge's indictment and arrest and Harvard's intended response.  That same day, Harvard sent letters via expedited delivery to the next of kin of all AGP donors from the past two decades.  The letters, signed by the dean of the faculty of medicine, informed recipients that Lodge had been indicted and arrested.  They further stated that "[t]hese alleged criminal acts are morally reprehensible and inconsistent with the standards that Harvard Medical School, our anatomical donors, and their loved ones expect and deserve. . . .  [W]e are deeply sorry for the pain and uncertainty caused by this troubling news."  The dean also wrote:
"We owe it to you, as well as our community, our profession, and our patients and their loved ones to ensure that [Harvard Medical School] is worthy of the donors who have entrusted their bodies to us for the advancement of medical education and research.  There is nothing more sacred and worthy of our attention and respect."
            Each letter informed the donors' next of kin whether a specific donor's remains were either "potentially impacted" by Lodge's criminal conduct or "not believed to be impacted."  Harvard made this determination based on "information supplied by [F]ederal authorities and [Harvard Medical School's] own records."  Based on information provided to Harvard by the United States Attorney's office, however, Harvard "may never know with certainty which donors in the 'potentially impacted' category were in fact affected."  Finally, in this message, Harvard also announced the appointment of "an external panel of experts to evaluate [its AGP] and morgue policies and practices, with the goal of providing constructive feedback and recommendations to improve security for the program and for the generous whole-body donations it receives."  The panel, comprised of three subject-matter experts unaffiliated with Harvard, began its work in June 2023 and publicly released the aforementioned report in November 2023.
            The report made numerous recommendations regarding improving security and oversight of the morgue's operations.  With respect to personnel, for example, the report recommended "rigorous background checks and screening in the hiring process for AGP staff," which "could include review of public-facing social media accounts, if consistent with Harvard's policies."  Although it recognized that the morgue's security practices were "expanded and enhanced" since Lodge's criminal conduct was revealed, the panel nevertheless recommended completion of ongoing security camera installations and upgrades in the morgue and its associated anatomy laboratory, rekeying of all key locks, and the assignment of all keys to specific individuals and to secure storage locations.  The AGP was also advised to allow visitors access to the morgue "only when accompanied by an individual with authorized access" and to implement a keycard access review process.  Such reviews would include "periodic checks of keycard data at regular and random intervals, with comparison to camera views," as well as "triggered" reviews in response to "defined unusual incidents[,] such as keycard use at non-business hours."
            The AGP's protocols for handling and tracking remains were also the subject of scrutiny.  According to its report, the panel "did not identify any institutional requirement or process to label and track donor specimens that are retained for long term uses," nor was it able to ascertain an "established schedule" for the AGP's reconciliation of the location of donated remains.  The panel further concluded that the AGP's methods for tracking and documenting donated remains were "not sufficient in their current form" and recommended the implementation of "additional steps . . . to request, review and document all specimens" and "connect them to their source (the donor)," including the introduction of an "entirely . . . electronic system" for "real-time donor and specimen location tracking" and "verification [of inventory practices] by a supervisor or another third party."
            The plaintiffs allege that the shortcomings in Harvard's morgue operations, and the dangers such shortcomings presented, should have been known to Harvard.  In support of these allegations, the plaintiffs point to a strikingly similar, highly publicized scandal that occurred in the medical school morgue at the University of California, Los Angeles (UCLA), in 2004, in which a morgue employee collaborated with an external party to obtain and sell body parts from donated cadavers over a four-year period.  Indeed, one of the panel experts selected by Harvard to evaluate the AGP's operations was previously hired by UCLA to oversee its morgue after the 2004 scandal.
            The plaintiffs also allege that Harvard disregarded guidance from the American Association of Anatomy (AAA), of which Harvard or Cicchetti and Fay were allegedly members, on the minimum standard of care required of medical schools like Harvard that store, use, and dispose of donated bodies.  According to the AAA guidance, "[f]acilities where cadavers are used must be appropriate and secured from entry by unauthorized personnel."  In addition, "[d]isposal of cadaveric remains should be documented and must follow all [S]tate and local regulations and requirements."  According to the plaintiffs' allegations, Harvard failed to comply with this minimum standard of care during the relevant period.
            d.  Lawsuits.  In 2023, forty-seven plaintiffs, all close relatives of individuals who donated their bodies to Harvard and whose bodies were identified as "potentially impacted" by Lodge's conduct, brought a total of twelve lawsuits against Harvard.  Four of these lawsuits also named Cicchetti and Fay as defendants.[7]  The complaints raise a variety of tort, contract, and statutory claims.[8]
            In October 2023, a judge of the Superior Court consolidated the twelve cases for pretrial purposes.  Thereafter, Harvard, Cicchetti, and Fay (together, defendants) filed a joint motion to dismiss all claims against them pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).  A different Superior Court judge (motion judge) allowed the motion and dismissed all claims with prejudice, concluding that the "factual allegations in the complaints do not plausibly suggest that [the defendants] failed to act in good faith in receiving and handling the donated bodies, or that they are legally responsible for Mr. Lodge's alleged misconduct."
            The plaintiffs timely appealed from the dismissal, arguing that (1) the motion judge erred in concluding that the UAGA's good faith provision applies to all stages of the anatomical donation process; and (2) even if this defense did so apply, the motion judge erred in concluding that the plaintiffs' pleadings were insufficient to support their claims that the defendants failed to act in good faith.  We transferred the case on our own motion.
            Discussion.  The "good faith" provision of the UAGA states, in relevant part:  "A person who acts in accordance with this chapter or with the applicable anatomical gift law of another [S]tate or who attempts in good faith to do so, shall not be liable for the act in a civil action, criminal prosecution or administrative proceeding."  G. L. c. 113A, § 18 (a).
            The plaintiffs contend that the provision applies only to the procurement and use of an anatomical gift.  Because the allegations in the complaint involve activity that took place after the remains had been put to their donative use, the plaintiffs argue that the good faith defense is not available to the defendants.  The plaintiffs further argue that, even if the good faith provision does apply to conduct occurring after the procurement process, the motion judge applied an incorrect standard when evaluating whether the plaintiffs' claims plausibly suggested the defendants failed to act in good faith.  Finally, the plaintiffs contend that the motion judge erred in holding that Lodge's criminal conduct could not be considered in determining whether Harvard could be held liable under the act, because bad faith conduct by an employee would thereby always be outside the scope of employment.  We review de novo questions of statutory interpretation and decisions on motions to dismiss.  See Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021); Pembroke Hosp. v. D.L., 482 Mass. 346, 351 (2019).
            1.  Scope of the UAGA good faith provision.  We begin with the plaintiffs' claim that the defendants may not rely upon G. L. c. 113A, § 18 (a), because the good faith defense applies only when a defendant violates a technical requirement related to the procurement process, and not the disposition of the human remains.  We are unpersuaded.
            First, we note that, contrary to the plaintiff's assertion, the UAGA speaks directly to the handling of anatomical remains both before and after their use.  See, e.g., G. L. c. 113A, § 14 (h) ("Subject to the terms of the document of gift and this chapter, a person who accepts an anatomical gift of an entire body may allow embalming, burial or cremation and the use of remains in a funeral service.  Upon the death of the donor and before embalming, burial or cremation, the person to whom a part shall pass under [§] 11 shall cause the part to be removed without unnecessary mutilation"); G. L. c. 113A, § 16 (b) ("A person may charge a reasonable amount for the removal, processing, preservation, quality control, storage, transportation, implantation, or disposal of a part").
            That there are no more specific, mandatory requirements for storage or disposal once the remains have been put to their donative use is not an indication that those steps are not integral to the act.  Cf. Scarbrough v. Transplant Resource Ctr. of Md., 242 Md. App. 453, 462 (2019) ("Although the [a]ct does not regulate the particular procedures that an organ procurement organization must follow in packaging, preserving, or transporting an organ, those activities are still an integral part of the donation and recovery process that the [a]ct covers").  Instead, the absence of specific requirements allows organizations subject to the act the flexibility to accommodate the wishes of donors and their families.  As Harvard itself recognized in its letter to the donors after Lodge's conduct became public, the dignified treatment and disposal of bodies donated for education and research is an essential part of the process.
            We also note that there is nothing in the text of § 18 (a) that limits the scope of good faith immunity to the procurement process.  Cf. Scarbrough, 242 Md. App. at 464-465 ("Had the General Assembly intended to limit the immunity to acts relating to determining consent and to the actual removal of organs, it could easily have said so").  To the contrary, by its terms, the good faith provision applies to conduct occurring "in accordance with this chapter."  G. L. c. 113A, § 18 (a).[9] Thus, the statutory language plainly indicates that when applicable, the good faith defense is available for actions taken throughout the anatomical gifting process, including the final disposal of the donated remains.  See Care & Protection of Jaylen, 493 Mass. 798, 802 (2024), quoting City Elec. Supply Co. v. Arch Ins. Co., 481 Mass. 784, 788 (2019) (statutory language "constitutes the principal source of insight into Legislative purpose" [quotation omitted]); Commonwealth v. Lightfoot, 391 Mass. 718, 720 (1984) (same).
            Furthermore, this interpretation of the provision is consistent with the legislative purpose as articulated in Carey, which characterized the good faith provision as "encourag[ing] the making of anatomical gifts by eliminating uncertainty as to the legal liability . . . while respecting dignified disposition of human remains" (quotation and citation omitted).  Carey, 446 Mass. at 272.  Donors making such anatomical gifts rightfully expect and require dignified treatment and disposition of such gifts.  Neither the obligations, nor the defense offered by the good faith provision, end before the disposition of the human remains.  The act should be read as a unified whole.  See Malloy v. Department of Correction, 487 Mass. 482, 496 (2021).
            2.  Application of the good faith provision.  Having determined that the UAGA's good faith provision is not limited to those actions connected with the procurement of anatomical donations, we turn to whether the plaintiffs have pleaded sufficient facts to overcome the defendants' good faith defense under the UAGA.
            For the reasons set forth infra, we conclude that the plaintiffs have so pleaded as to Harvard and Cicchetti.  The plaintiffs have not, however, pleaded sufficient facts to withstand Fay's asserted good faith defense and, by extension, the motion to dismiss concerning the claims against Fay.
            a.  Claims against Harvard.  As discussed supra, § 18 (a) specifies that "[a] person who acts in accordance with [the UAGA] . . . or who attempts in good faith to do so, shall not be liable."  The UAGA defines "person" as "an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, public corporation, government or governmental subdivision, agency or instrumentality or any other legal or commercial entity."  G. L. c. 113A, § 2.  Because Harvard is a "person" as defined by the UAGA, Harvard has a statutory defense unless it failed to "attempt[] in good faith" to comply with the UAGA.  G. L. c. 113A, § 18 (a).
            In Carey, 446 Mass. at 282, we defined "good faith" as "an honest belief, the absence of malice, or the absence of a design to defraud or to seek an unconscionable advantage over another."  We further explained that "it may be possible that evidence of a peculiarly pervasive noncompliance [with the act] could warrant an inference that a defendant acted maliciously, possessed a design to defraud or to seek an unconscionable advantage over the plaintiffs, or acted out of something other than an honest belief" and thus failed to act in good faith.  Id. at 284.  See Sattler v. Northwest Tissue Ctr., 110 Wash. App. 689, 697 (2002) ("Good faith involves a factual inquiry, and the actor's conduct must be judged in light of all the circumstances then present").  We conclude that the plaintiffs' factual allegations rise to this level and therefore warrant an inference that Harvard failed to act in good faith.
            We reach this conclusion for several reasons.  First, the facts alleged constitute "peculiarly pervasive noncompliance" with the act.  Carey, 446 Mass. at 284.  Instead of the dignified treatment and disposal of human remains required by the act, the donors' remains were ghoulishly dismembered and sold for profit under the most horrifying of circumstances.  See Schoeller v. Board of Registration of Funeral Directors & Embalmers, 463 Mass. 605, 617 (2012), quoting Kelly v. Brigham & Women's Hosp., 51 Mass. App. Ct. 297, 308 (2001) ("there is 'a special sensitivity' required in the processing and handling of a deceased human body"); Burney v. Children's Hosp., 169 Mass. 57, 59-60 (1897) ("There is a duty imposed by the universal feelings of mankind to be discharged by some one towards the dead; a duty, and we may also say a right, to protect from violation" [citation omitted]).  This horrific and undignified treatment continued for years and involved numerous donors.
            Although we focus our inquiry on Harvard's conduct, Lodge's misdeeds are relevant insofar as they demonstrate where Harvard failed to act in good faith in operating and overseeing the morgue.  Despite the risk of harm being known to Harvard, as similar misconduct had previously occurred in a strikingly similar fashion in another medical school morgue, there were little to no controls in place to prevent this harm from occurring at Harvard.  Instead, according to the allegations, an unsupervised Lodge was able to dismember the donated bodies; bring unauthorized people into the morgue to inspect and purchase body parts, including during working hours; and carry body parts out of the morgue for years.  Other red flags, such as his license plate describing himself as the "Grim-R[eaper]," which revealed an unprofessional insensitivity given his position in a medical school morgue, were also ignored or tolerated.[10]  Thus, Harvard's extraordinary failure to adequately supervise the morgue's operations and properly protect the donated remains in its care exemplifies the kind of "peculiarly pervasive noncompliance" we have said can demonstrate a lack of good faith.[11]  Carey, 446 Mass. at 284.
            We emphasize that "peculiarly pervasive noncompliance" is different in kind and not just degree from isolated acts of noncompliance, which alone are insufficient to defeat a good faith defense under the act.  See Carey, 446 Mass. at 283.  See also id. at 284 ("The few mistakes in the consent form . . . provide no evidence of lack of good faith").  Cf. also Ramirez v. Health Partners of S. Ariz., 193 Ariz. 325, 329 (1998) ("Most claims alleging unauthorized harvesting of body parts . . . will arise from acts or omissions that deviate from the [Arizona Uniform Anatomical Gift] Act's terms in some respect").  Isolated instances of noncompliance, even if they would constitute negligence, are not enough.  Here, as discussed supra, however, the allegations constitute "peculiarly pervasive noncompliance" and are thus sufficient to warrant an inference that Harvard did not act in good faith and to thereby defeat a motion to dismiss.[12]  Carey, supra.
            We also emphasize that our holding today is not based on respondeat superior liability.  As the motion judge correctly concluded, an employer may only be held vicariously liable for the conduct of an employee that falls "within the scope of . . . employment."  Conduct falls within the scope of employment when (1) "it is of the kind [the employee] is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; and (3) "it is motivated, at least in part, by a purpose to serve the employer."  Lev v. Beverly Enters.-Mass., Inc., 457 Mass. 234, 238 (2010), quoting Mosko v. Raytheon Co., 416 Mass. 395, 399 (1993).  See Berry v. Commerce Ins. Co., 488 Mass. 633, 637, 639-640 (2021) (holding that police officer was not acting within scope of employment when he struck another officer with his vehicle while driving carelessly when returning from paid lunch break to firearm range to conduct mandatory training).  See also Kansallis Fin. Ltd. v. Fern, 421 Mass. 659, 666 (1996) ("The scope of employment test asks the question:  is this the kind of thing that in a general way employees of this kind do in employment of this kind").
            Lodge's unauthorized harvesting and selling of body parts for personal profit does not satisfy this test.  First, harvesting and selling portions of bodies donated to Harvard for research and education purposes was not conduct of "the kind [Lodge was] employed to perform" (citation omitted).  Lev, 457 Mass. at 238.  Additionally, selling body parts for personal profit was hardly "motivated, at least in part, by a purpose to serve the employer" (citation omitted).  Id.
            Harvard may, however, be held responsible for its own misconduct.  It had a legal obligation to provide for the dignified treatment and disposal of the donated human remains, and failed miserably in this regard, as Harvard itself recognized.  Harvard also had a duty to oversee Lodge's conduct and to place proper controls over the morgue itself –- both of which it allegedly disregarded for years.
            In sum, these allegations amount to "peculiarly pervasive noncompliance" with the act, warranting an inference that Harvard failed to act in good faith.  Carey, 446 Mass. at 284.
            b.  Claims against Cicchetti and Fay.  As discussed supra, we must review whether the factual allegations contained in the various complaints plausibly suggest that Cicchetti or Fay failed to act in good faith.  To prevail on a motion to dismiss, a complaint must allege facts beyond the speculative level that entitle a plaintiff to relief.  Bresler v. Muster, 496 Mass. 111, 116 (2025).  Again, the plaintiffs must allege facts sufficient to support a finding that the defendants did not act in good faith.  See Carey, 446 Mass. at 282.
            The four complaints in which Cicchetti and Fay are named collectively raise five claims against them:  negligence, negligent infliction of emotional distress, breach of fiduciary duty, tortious interference with remains, and respondeat superior liability.[13]  For the reasons that follow, we conclude that at least some of the plaintiffs' claims withstand the motion to dismiss as to Cicchetti,[14] but no claims withstand the motion as to Fay.
            i.  Cicchetti.  Accepting as true the plaintiffs' factual allegations in the complaint, and drawing all reasonable inferences in the plaintiffs' favor, we conclude that the motion judge erred in dismissing all claims against Cicchetti under the UAGA's good faith provision.  See Lanier v. President & Fellows of Harvard College, 490 Mass. 37, 39-40 (2022); Shaw's Supermkts., Inc. v. Melendez, 488 Mass. 338, 339 (2021).
            Although the plaintiffs offer few specific facts in support of their claims against Cicchetti, what they do offer is sufficient to overcome Cicchetti's protection from liability under the UAGA, at least at this early stage of the proceedings.  The nature of Cicchetti's role as the AGP's managing director, according to the pleadings, involved oversight of both Lodge and the morgue's over-all operations.  Cicchetti's duties included both "supervisory" and "compliance-related responsibilities" for the AGP, and Lodge reported directly to Cicchetti at all relevant times.
            Despite his responsibilities, Cicchetti allegedly failed to provide for the dignified treatment and disposal of the anatomical gifts as required by the act.  Cicchetti also failed to detect or prevent Lodge's dismemberment of bodies in the morgue, introduction of unauthorized persons to the morgue during working hours, and removal of body parts to his home, which allegedly went on unimpeded for years.  In short, Lodge was purportedly allowed to run "amok" on Cicchetti's watch.
            Moreover, as discussed in greater detail supra, the plaintiffs pleaded sufficient facts demonstrating that Harvard and its "managers" –- a group to which Cicchetti, as the operational head of the AGP, ostensibly belongs -- "would have been aware of the risks revealed by the UCLA case and the necessity for strict auditing practices related to security, personnel and staffing" and failed to take "basic reasonable steps" in managing the AGP in response, such as adequately deploying cameras to monitor the morgue, ensuring all morgue visitors obtained management approval before entering, and utilizing appropriate inventory management systems.  As indicated supra, the findings and recommendations of the expert panel retained to assess the AGP provide additional factual support for this inference.
            Independently of Cicchetti's managerial role, the plaintiffs have also offered sufficiently specific facts from which to reasonably infer Cicchetti's frequent presence, and thus his frequent opportunities to observe activity, in the morgue during the relevant period.  Cicchetti, for example, performed the onsite embalming of all donated remains and selected specimens for specific educational uses.
            When viewing the pleadings as a whole and drawing all reasonable inferences therefrom in the plaintiffs' favor, we conclude that the plaintiffs have, for the purposes of a motion to dismiss, adequately pleaded Cicchetti's "peculiarly pervasive noncompliance" with his responsibilities under the UAGA as the AGP's managing director.  Such pleadings accordingly warrant an inference that Cicchetti did not act in good faith.  The motion judge therefore erred in dismissing claims against Cicchetti on the basis of the UAGA's good faith protection from liability.
            ii.  Fay.  In contrast, the factual allegations against Fay are insufficient to overcome her assertion of protection from liability under the UAGA.  As noted supra, and as the plaintiffs correctly identified in their pleadings, Fay was the manager of the AGP in the relevant period, not the managing director.  In this position, she carried out the program's administrative tasks and managed communications with donors and donors' next of kin.  The plaintiffs nonetheless draw conclusions as to Fay's role and responsibilities that seem to issue from the mere fact of her title as "manager."  These speculative legal conclusions are unmoored from the facts offered by the plaintiffs regarding Fay's role and ignore the distinct responsibilities of the manager and the managing director as set forth in the pleadings and other documents submitted by the plaintiffs in support of their claims.[15]
            Importantly, the plaintiffs' pleadings gloss over the distinction between Fay's and Cicchetti's roles with respect to the supervision of Lodge.  As the managing director, Cicchetti, as noted supra, was the over-all head of the AGP and the direct supervisor of both Fay and Lodge.  In contrast, Fay had no supervisory responsibilities as to Lodge or, as far as factually presented in the pleadings, any compliance-related responsibilities more broadly.  Fay's office was also not in the morgue, and there is no factual basis on which to conclude that Fay was regularly required to be in that space.
            Given Fay's job responsibilities and limited presence in the morgue, the allegations against her do not plausibly suggest the requisite "peculiarly pervasive noncompliance."  The plaintiffs' assertions regarding Fay thus appear to be "devoid of factual support" and "rest[] solely on conclusory assertions."  Bresler, 496 Mass. at 121.  See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level").  Accordingly, the plaintiffs have not sufficiently pleaded facts demonstrating Fay's "peculiarly pervasive noncompliance" with her obligations under the act and, by extension, a lack of good faith in Fay's performance of her duties as the AGP manager.  See Sattler, 110 Wash. App. at 697 ("Good faith involves a factual inquiry, and the actor's conduct must be judged in light of all the circumstances then present").  See also Carey, 446 Mass. at 284 (circumstantial evidence of lack of care "give[s] rise to no more than conjecture or suspicion of lack of good faith").  Fay therefore cannot be held liable under the UAGA, and the motion judge properly dismissed all claims against her.
            Conclusion.  We conclude that the UAGA's good faith protection from liability is applicable to the entire anatomical donation process from procurement to disposition.  We further conclude that "peculiarly pervasive noncompliance" with the requirements of the act, including a failure to ensure the dignified treatment and disposition of anatomical gifts, is sufficient to warrant an inference of a lack of good faith.
            Because the plaintiffs adequately pleaded "peculiarly pervasive noncompliance" against Harvard and Cicchetti, we reverse so much of the order allowing the motion to dismiss against Harvard and Cicchetti, except as to so much of that order that dismisses the plaintiffs' claims of respondeat superior liability against them, which we affirm.  We also affirm so much of the order allowing the motion to dismiss all claims against Fay, as the plaintiffs failed to allege facts plausibly suggesting that Fay's conduct constituted "peculiarly pervasive noncompliance" with her responsibilities under the act.  We therefore affirm the order to dismiss in part, reverse in part, and remand for further proceedings consistent with this opinion.
So ordered.

footnotes

            [1] Individually and on behalf of all others similarly situated.
            [2] Nicole MacTaggart & another vs. President and Fellows of Harvard College & others; Glenn Wilder & others vs. President and Fellows of Harvard College & others; Irene Ray & others vs. President and Fellows of Harvard College; Dianne L. DePalma & others vs. President and Fellows of Harvard College; Benjamin Brophy vs. President and Fellows of Harvard College; Robert Johnson & others vs. President and Fellows of Harvard College; Patricia Beckett vs. President and Fellows of Harvard College & others; Mary D. Lombardi vs. President and Fellows of Harvard College & others; Linda Casadonte & others vs. President and Fellows of Harvard College; Spencer Newton & others vs. President and Fellows of Harvard College; and Riccardo Servizio & others vs. President and Fellows of Harvard College.
            [3] We acknowledge the amicus brief submitted by the Joan and Sanford I. Weill Medical College and Graduate School of Medical Sciences of Cornell University.
            [4] The Legislature amended the act in 2012.  See St. 2012, c. 39, §§ 2, 3.  All fifty States and the District of Columbia have adopted some form of the UAGA.  See Carey v. New England Organ Bank, 446 Mass. 270, 272 (2006).
            [5] In the relevant Federal indictment, discussed infra, and in the plaintiffs' complaints, Lodge is referred to as the AGP's "Morgue Manager."  According to Harvard, "[w]hile [Lodge] has been referred to as Morgue Manager, he worked under the director of the AGP program and did not manage any other employees."  The November 2023 "Summary Report on the Harvard Medical School Anatomical Gift Program" (postevent report), which Harvard commissioned in response to the events at issue in this case, describes Lodge's position as that of the AGP staff assistant.
            [6] The indictment listed as defendants Lodge; Katrina Maclean, Lodge's customer and the proprietor of "Kat's Creepy Creations"; Joshua Taylor, Lodge's customer; and Denise Lodge, Lodge's wife, who assisted with shipping and collecting payments for the body parts.  The defendants were charged with violations of 18 U.S.C. §§ 2, 371, and 2314; the indictment also contained a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461.  Lodge pleaded guilty to trafficking in stolen human remains on May 21, 2025.
            [7] Several of the suits are class actions in which the named plaintiffs seek to represent hundreds of people whose relatives' remains may have been dissected and sold.  A majority of the complaints also assert claims against Lodge, which are not at issue in this appeal.
            [8] Across the complaints, the plaintiffs raise the following claims against the three defendants:  negligence; negligent infliction of emotional distress; negligent hiring, supervision, or retention; reckless infliction of emotional distress; intentional infliction of emotional distress; unjust enrichment; tortious interference with remains or wrongful autopsy; respondeat superior; breach of fiduciary duty; breach of contract; violations of G. L. c. 93A; and equitable (injunctive and declaratory) relief.
            [9] The expression "in accordance with" suggests a more expansive understanding of actions beyond those simply required by the statute; it includes those acts naturally implied by the statute's entire text and aims.  Cf. W.R. Grace & Co. v. Hartford Acc. & Indem. Co., 407 Mass. 572, 579-580 (1990) (expression "in accordance with the law and practice" of particular court "refers to the whole law of the jurisdiction, including [related] principles").
            [10] Lodge also either was "placed on" or "took" at least two leaves of absence from Harvard, one of which spanned a five-month period and the other of which began shortly before the FBI alerted Harvard to the pending indictment.  The reasons for the two absences are not explained in the record before us.  Further discovery may be necessary to determine if these absences are relevant to whether Harvard was properly supervising Lodge.
            [11] The allegations may also support a determination that Harvard took "unconscionable advantage" of the donors' and their families' generosity, again demonstrating a lack of good faith.  Carey, 446 Mass. at 282 (defining "good faith" as, inter alia, "the absence of a design to . . . seek an unconscionable advantage over another").  Harvard described the AGP as an "altruistic" program in which "generous donations support the teaching of medical and dental students" and noted that "[p]rivate donation is the sole source of these precious education and research resources."  The AGP that Harvard designed allegedly took full advantage of these precious donations for education and research purposes, but neglected its reciprocal obligation to ensure respectful treatment of the donors' remains after they had been put to their donative uses.
            [12] The plaintiff bears the burden of proving a lack of good faith.  See Carey, 446 Mass. at 282.  At the motion to dismiss stage, the plaintiff must allege facts that plausibly suggest that the defendant failed to act in good faith.  See Bresler v. Muster, 496 Mass. 111, 116 (2025), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).  And "where a defendant moving for summary judgment contends, and makes at least a minimal showing, that it acted in good faith within the meaning of [the good faith provision], the burden falls to the plaintiff[] to identify competent evidence sufficient for a reasonable jury to find to the contrary."  Carey, supra at 283.
            [13] Specifically, all four complaints allege negligent infliction of emotional distress.  Two of the four complaints allege both negligence and respondeat superior liability, while the remaining two complaints allege breach of fiduciary duty and tortious interference with remains.
            [14] For the same reasons, the respondeat superior claims against Harvard should be dismissed, and because Cicchetti was not Lodge's employer, the respondeat superior claims against Cicchetti should also be dismissed.  See Kavanagh v. Trustees of Boston Univ., 440 Mass. 195, 198 (2003) ("Broadly speaking, respondeat superior is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment" [emphases added; citation omitted]); Pettiford v. Branded Mgt. Group, LLC, 104 Mass. App. Ct. 287, 291 (2024) ("As a general rule, the doctrine [of respondeat superior] applies to hold an employer liable for the tortious or 'tort-like conduct,' of its employee").  See also Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 322 (2002), citing Restatement (Second) of Agency § 220(2) (1958) (for purposes of respondeat superior claim, judge must determine whether employer-employee relationship exists by considering factors such "the method of payment [e.g., whether the employee receives a W-2 form from the employer], and whether the parties themselves believe they have created an employer-employee relationship"); Santos v. Kim, 429 Mass. 130, 131, 136 (1999) (in medical malpractice suit, claim against medical center's associate chief not involved in plaintiff's care inappropriate because "[s]uch a rule would, in effect, make individual supervisors personally responsible not as employers - which they rarely are -- but under a version of respondeat superior, which has regularly been rejected in the medical as well as other contexts").
            [15] In some of the complaints, for example, the plaintiffs state that Fay was the AGP manager in the period in which Lodge was engaged in criminal activity.  The plaintiffs then conclude that, "[a]s such," Fay was "responsible for monitoring the [AGP], including the [Harvard Medical School] morgue, on a daily basis and submitting a yearly review"; had "a duty to supervise and monitor the conduct and actions of [Lodge] and the operation of the morgue"; had a duty to "safeguard" donated cadavers and ensure they "were not defiled for non-anatomical research purposes" at the conclusion of their study; and "negligently failed to take reasonable steps" both to ensure proper handling and maintenance of donated cadavers and in the "hiring, training, supervision, and retention" of Lodge.  The "[a]s such" language demonstrates that these are the plaintiffs' legal conclusions regarding the responsibilities of the AGP manager, rather than assertions of fact or reasonable inferences drawn therefrom.